# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

_____  :

UNITED STATES OF AMERICA,     :

                       :     Crim. No. 09-369 (WJM)

       Plaintiff,          :

                       :

v.                     :     **OPINION AND ORDER**

                       :

PAUL BERGRIN, et. al.,      :

                       :

       Defendants.       :

_____  :

**ARLEO,** U.S.M.J.

Before the Court is the request of the United States for pretrial detention of defendant Paul Bergrin ("Bergrin") and Bergrin's request for bail pending trial pursuant to 18 U.S.C. § 3142(f). This Court held a hearing on May 27 and 28, 2009, and the Court reserved ruling on the parties' applications. Set forth below are the Court's findings of fact and rulings on the pending applications.

## I.    BACKGROUND

### A.    <u>The Indictment</u>

The indictment charges defendant Bergrin with various offenses, including Racketeering and Racketeering Conspiracy (18 U.S.C. §§ 1962(c), (d)), Wire Fraud and Wire Fraud Conspiracy (18 U.S.C. §§ 1343 and 1349), Murdering a Federal Witness and Conspiracy to Murder a Federal Witness (18 U.S.C. § 1512), and Travel Act violations and Conspiracy to Commit Travel Act violations (18 U.S.C. §§ 1952 and 371). If convicted, Bergrin faces a maximum penalty of death and a mandatory minimum penalty of life imprisonment. Essentially,

the indictment alleges that Bergrin used his law firm to carry out a pattern of criminal activities. Specifically, the indictment charges Bergrin with using his criminal enterprise for the purpose of manipulating the criminal justice system, by bribing, intimidating and murdering witnesses. In addition to murdering witnesses and racketeering, the indictment charges Bergrin with traveling in aid of his racketeering enterprise and committing wire fraud through his participation in fraudulent real estate transactions.

The factual basis for the murder and travel in aid of racketeering charges are set forth below.[1]

---

[1]The government relied on Special Agent Michael Smith's testimony and his Certification in support of detention, which was marked as government exhibit PB-1 and moved into evidence without objection, at the detention hearing. The Court will refer to Agent Smith's Certification throughout this opinion. The Court also entered into evidence exhibits, all of which the government disclosed to Bergrin prior to the testimony of Agent Smith. They include:

1. Exh. PB 1-A: Transcripts of multiple recorded conversations of Bergrin and a confidential informant;

2. Exh. PB-2: Excerpts from the transcript of Anthony Young's testimony during the William Baskerville criminal trial;

3. Exh. PB-3: Agent Smith's Certification containing his handwritten notes;

4. Exh. PB-4: Three checks drawn on the accounts of Jerrold N. Kaminsky, Susan J. Barone, Esq., and Gary Bootes, respectively;

5. Exh. PB-5: Partial Transcript of a December 9, 2008, recorded conversation between Bergrin and a confidential informant;

6. Exh. PB-6: Redacted page from an investigative written report with 57 pages of Bergrin's documents attached thereto;

7. Exh. PB-6-A: Nine pages of documents retrieved pursuant to a search conducted by the Manhattan District Attorney in January 2007; and

B.     Murder Plot To Kill A Witness In The William Baskerville Federal Case

Bergrin represented William Baskerville ("Baskerville") in connection with his arrest and federal charges for narcotics distribution in November 2003.  (Indictment, Count 3, ¶ 5; Special Agent Michael Smith Certification, identified as Gov't. Exh. PB-1 ("Exh. PB-1"), at ¶ 10).  During Baskerville's 2007 trial before the Honorable Joel E. Pisano, U.S.D.J., the government called Anthony Young ("Young") to testify as a witness.  Young testified that Bergrin participated in both telephone and in person conversations with Baskerville's alleged drug associates.

During one such telephone conversation, Bergrin conveyed the identity of an informant, known as "Kemo."  (Exh. PB-2 identified as an Excerpt of the Trial Transcript of Young's Testimony ("Exh. PB-2"), at 4352:2-8).  Young testified about an in person meeting involving him, Bergrin and Baskerville's associates.  At this meeting, they discussed, among other things, the effect that Kemo's testimony would have on the outcome of Baskerville's case.  Young testified that Bergrin explained, "[i]f somebody was to testify against [Baskerville] . . . and if we didn't get rid of that person, that Will Baskerville would never see the streets again in his life."  (Exh. PB-2 at 4360:11-14).  Young further testified as follows:

> He [Bergrin] said if there was no Kemo to testify against Will,
> there would be no case

---

8.     Exh. TM 1-A: Transcripts of multiple recorded conversations of co-defendant Thomas Moran and a confidential informant.

The Court also marked as defense exhibit, D-1, which was identified as a May 27, 2009, letter from Jihadah S. Azziem-Sharif of The Creative Spirits of the State of New Jersey, to the Court, attesting to Bergrin's strong moral character and community involvement.  The defense disclosed Exh. D-1 at the start of the detention hearing.

. . . .

> He just said, if Kemo was dead, that Will Baskerville would
> definitely come home from jail

. . . .

> When he [Bergrin] left [the meeting], he said, remember what I
> said, no Kemo, no case.

(Id. at 4361:1-2, 9-10, 24-25).

Young further testified about a subsequent meeting between him and some of

Baskerville's drug associates, wherein they discussed Kemo in the context of Baskerville's

criminal prosecution. Young testified that during this meeting, "[i]t was discussed that we got to

start looking for this guy, to get him off the streets so that he couldn't testify against Will." (Id.

at 4362:15-17). On March 2, 2004, one of Baskerville's drug associates, known as A.Y., fatally

shot Kemo three times in the back of the head. (Exh. PB-1 at ¶ 11; Indictment, Count 3, ¶ 11 and

Count 4, ¶ 2).

C.     Conspiracy To Murder A Witness In The Vicente Esteves State Case

The indictment also charges that Bergrin was involved in the unsuccessful conspiracy to

murder a witness in connection with the prosecution of Esteves, Bergrin's client and co-

defendant in the instant indictment

In May 2008, Esteves retained Bergrin to defend him against drug charges brought in the

Superior Court of New Jersey, Monmouth County. (Exh. PB-1 at ¶ 12). After being retained,

Bergrin contacted a hitman on behalf of Esteves. (Id. at Count 5, ¶ 6; Exh. PB-1 at ¶ 12). During

a series of recorded conversations, Bergrin advised the hitman, who later became a confidential

informant for the government, that Esteves believed certain persons were serving as cooperating

witnesses for the prosecution against Esteves.  (Exh. PB-1 at ¶ 12).  Bergrin then told the

confidential informant that both Esteves and Bergrin wanted him to locate and kill these

witnesses for the prosecution.  (Id.)

On August 5, 2008, Bergrin met with the confidential informant in Chicago, wherein

Bergrin identified an individual referred to as "Junior the Panamanian" as a potential witness

against Esteves.  (Indictment, Count 5, ¶ 8b).  Bergrin further explained that he would provide

the confidential informant with instructions on where to locate Junior the Panamanian.  (Id.)

During a recorded meeting between Bergrin and the confidential informant on September 4,

2008, the following exchange took place about the murder plot of Junior the Panamanian:

> CONFIDENTIAL INFORMANT: I had two concerns, the first
> thing is when I talked to Vinny [Esteves] on the phone everything
> went good. But it seemed like he was more concerned about the
> truck driver than the Panamanian cat, is that true or what do you
> think? You tell me what?
>
> BERGRIN: No, the Panamanian guy he said he's here in New
> Jersey
>
> . . . .
>
> CONFIDENTIAL INFORMANT: Okay. So I want to take care of
> both of them if it's possible.  So I'll start with the Panamanian.

(Exh. PB 1-A at 6; see Indictment, Count 5 at ¶ 8f).

During a subsequent meeting on October 2, 2008, the following conversation took place:

> CONFIDENTIAL INFORMANT: You just gave me the one
> address, I need more on him.  See how this guy looks you know
> what I'm saying?  And I'll take care of everything else.  The thing I
> wanted to meet you with.  I met that guy Mike Lopez.  He don't
> know shit Pauly, I just need you to set something up with him and
> Jason again 'cause I want to find this motherfucker.  The old man's
> on me, I'm tired of it.  This is the only job I ever had that took this

long.  It would have been done a long time ago Pauly.

BERGRIN:  Ok.

CONFIDENTIAL INFORMANT: I need for you to set it up
possibly next week.

BERGRIN:  I'll hook you up with another guy named Fu
               . . . .

CONFIDENTIAL INFORMANT:  Oh ok.  Yeah set me up with
him next week sometime, and we'll take it from there.

BERGRIN: Alright.

CONFIDENTIAL INFORMANT: I want to take care of this
motherfucker, just kill him, take care of him, get rid of him.

(Id. at 11; Indictment, Count 5 at ¶ 8h and Count 7, ¶ 2).

On December 8, 2008, Bergrin again met with the confidential informant, wherein they

again discussed the murder plot against Junior the Panamanian.  (Exh. PB-1 at ¶ 15).  The

following exchange took place:

BERGRIN:  [P]ut on a ski mask and make it look like a robbery
and take all the money in the house.

CONFIDENTIAL INFORMANT: But listen to me, listen to me....

BERGRIN: "No, but we can make it look like a robbery.  It cannot
under any circumstances look like a hit.

CONFIDENTIAL INFORMANT: Hmm, smart.  I was saying fuck
his money, I got money.

BERGRIN: No, I'm not worried about the money, but make it look
like a home invasion robbery. . . (pauses) We have to hit him when
the girlfriend is at work. . . .

CONFIDENTIAL INFORMANT: Why?

6

BERGRIN: Just one . . . she's nothing.

CONFIDENTIAL INFORMANT: That's exactly the point.

BERGRIN: She's nothing in the case. Double the . . . double the pressure, you understand?

CONFIDENTIAL INFORMANT: Double what?

BERGRIN: Double the pressure . . . you understand me? [Unintelligible] . . . with her it makes it double the pressure. Leave her alone.

CONFIDENTIAL INFORMANT: I got it Paul.

(Exh. PB 1-A at 15; <u>see</u> Indictment, Count 5, ¶ 8m and Count 8, ¶2).

      D.     <u>Other Predicate Acts</u>

Agent Smith's Certification details other acts of witness tampering, intimidation and killing in numerous criminal prosecutions that were pending in state court in New Jersey. (Exh. PB-1 at ¶¶ 16-23). Furthermore, the indictment sets forth that Bergrin operated his criminal enterprise through the guise of his law firm to engage in criminal activities, including witness tampering and conspiracy to commit murder. (<u>See</u> Indictment, Counts 1-2). The indictment further recites Bergrin's plot to kill witnesses or otherwise prevent them from testifying for the prosecution in the Esteves case. (<u>See</u> Indictment, Counts 5-7).

      E.     <u>Fraud Charges</u>

The indictment also sets forth Bergrin's fraudulent acts involving real estate transactions. This conduct serves as the factual basis for the wire fraud charges against Bergrin. (<u>See</u> Indictment, Counts 9-14).

      F.     <u>Procedural History</u>

On May 20, 2009, Bergrin had his initial appearance before this Court pursuant to 18 U.S.C. § 3142(a). At the request of Bergrin, the Court set his case down for a detention hearing on May 27, 2009.

On May 27 and 28, 2009, this Court conducted a detention hearing. The government proceeded by proffer, relying on the Smith Certification and several documents admitted into evidence at the hearing described above. At the request of defendant, Agent Smith was called as a witness.

## II. DISCUSSION

### A. The Bail Reform Act

Generally, a defendant must be released on bail on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance and the safety of the community. See 18 U.S.C. § 3142(c)(B). However, section 3142(e)(1) provides in relevant part:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial.

If the government moves for detention on the basis of danger to the community, it must prove this by clear and convincing evidence. United States v. Traitz, 807 F.2d 322, 325 (3d Cir. 1986). If the government establishes a risk of flight, it must prove this by a preponderance of the evidence. United States v. Himler, 797 F.2d 156, 161 (3d Cir. 1986). See generally United States v. Schenberger, 498 F. Supp. 2d 738, 740-41 (D.N.J. 2007).

The government may move for detention on the basis of danger to the community only for an offense that is listed in 18 U.S.C. § 3142(f)(1)(A) to (E). Here, the United States may move for pretrial detention on dangerousness grounds pursuant to subsection (f)(1)(A) which references a "crime of violence," and (f)(1)(B), which relates to "any offense for which the maximum sentence is life imprisonment or death." If probable cause exists to believe that a defendant committed either a "crime of violence" or an offense for which the maximum penalty is life in prison or death, then a rebuttable presumption exists that no condition or combination of conditions will reasonably assure the safety of any other person and the appearance of the person as required. 18 U.S.C. § 3142(e). In this case, probable cause exists because an indictment was issued against Bergrin for alleged violations of 18 U.S.C. §§ 1512(k), 1512(a)(1)(A), and 1512(a)(3)(A) (i.e., the murder charges).

Once the rebuttable presumption is established, the burden is then placed on the defendant to produce countervailing evidence that forms a basis for his contention that he will appear and will not pose a threat to the community. U.S. v. Carbone, 793 F.2d 559, 560 (3d Cir.1986). If the defendant meets this burden of production, the burden shifts back to the government to prove a risk of flight by a preponderance of the evidence or dangerousness by clear and convincing evidence. United States v. Perry, 788 F.2d 100, 114-15 (3d Cir.1986). The burden of persuasion always rests with the government. Id.

Bergrin cannot dispute that this is a "rebuttable presumption" case. In order to rebut the presumption, Bergrin contends, as he must, that if he is released he would agree to all of the conditions set forth in 18 U.S.C. § 3142(c)(1)(B). Bergrin also has proposed to abide by the following conditions of release:

(a) Bergrin will post a $1 million bond, secured by the three separate properties, with the estimated equity amounting to $480,000, $242,000, and $325,000, respectively;

(b) Contemporaneous with his release from prison, Bergrin will be transported directly to his home by a private security firm pre-approved by the government and paid for by Bergrin. This security firm will make periodic unannounced visits to Bergrin's home to further ensure his compliance with the rest of the conditions of release set forth herein. Any violation of these conditions will be immediately reported to both the government and the Court;

(c) Bergrin will be subject to 24-hour home confinement, except for any occasions authorized by the Court in advance;

(d) Bergrin will wear an electronic monitoring device (including GPS monitoring), paid by Bergrin, that conforms with procedures specified by Pre-Trial Services;

(e) At the time of his pretrial release, all telephone and other communications devices, including computers with internet access, blackberries, cell phones, and pagers, will be removed from Bergrin's house, except for a single land-line telephone which the government will monitor and a second line used solely for electronic monitoring purposes. This telephone line will be monitored by the private security firm as mentioned in paragraph (b) above;

(f) If any person intends to visit Bergrin's home, the dates and times of their visits must be pre-approved by the government, in writing;

(g) Bergrin will surrender his passport and any other travel documents that he possesses;

(h) Bergrin will immediately suspend the practice of law, including any communication with current or former clients; however, current employees of Bergrin's law firm will be permitted to wind down any active client files to ensure that Bergrin's clients' interests are protected; and

(I) Bergrin will be released into his wife's custody, who will ensure his compliance with the conditions listed above.

(May 26, 2009, Df Ltr Brf at 4-5).

For the reasons discussed in this Opinion, this Court does not believe Bergrin has

rebutted the presumption of detention. Additionally, even if this Court ruled that Bergrin rebutted the presumption, the government has proved by clear and convincing evidence that no condition or combination of conditions – including the ones offered by Bergrin -- will reasonably insure the safety of the community. The government has also proved by a preponderance of the evidence that no condition or combination of conditions exist that will reasonably insure Bergrin's appearance at trial.

B.     Factors To Be Considered By The Court

The factors a court must consider in determining whether bail or detention is appropriate are set forth in 18 U.S.C. § 3142(g). They include the nature and circumstances of the offense charged, including whether the offense is a crime of violence, the weight of the evidence against the defendant, the history and characteristics of the defendant and the nature and seriousness of the danger to any person or the community that would be posed if the defendant is released.

(1) Nature and Circumstances of the Offense Charged

The first factor this Court must examine is the "nature and circumstances" of the offense charged. Here, Bergrin is charged with murdering a federal witness for which he may face the death penalty. It is beyond dispute that murder is the most serious of crimes. See Coker v. Georgia, 433 U.S. 584, 598 (1977) (noting that "in terms of moral depravity and of the injury to the person and to the public," other violent crimes, such as rape, do not compare with murder). Indeed, "[t]he murder of a Government witness is one of the most serious crimes that may be brought against anyone." United States v. Jones, 566 F. Supp. 2d 288, 291 (S.D.N.Y. 2008).

However, the Court's analysis is not simply limited to the charge itself, but the "nature and circumstances" of the charge. United States v. Abdullahu, 488 F.Supp. 2d 433 (D.N.J.

2007).  As the indictment charges, the circumstances here demonstrate that Bergrin operated a

criminal enterprise – his law firm –  for the specific purpose of manipulating the criminal justice

system, by among other things, bribing, intimidating and killing witnesses.  Through the criminal

enterprise, Bergrin allegedly directly participated in murdering a federal witness and directly

participated in a plot to kill witnesses in the Esteves case.  Viewed in context, the offenses here

are especially egregious.

      (2) <u>Weight of the Evidence</u>

The second factor this Court must examine in its detention analysis is the "weight of the

evidence."  The indictment describes the two most serious predicate racketeering acts: the

murder of the witness in the Baskerville trial ("the Baskerville murder") and the attempted

murder of the witness in the Esteves narcotics case ("the Esteves attempted murder").  In

addition to those two acts, the Smith Certification details other examples in which Bergrin,

through his law firm, "advised, counseled, solicited and demanded his clients kill witnesses

against them in criminal cases so that Bergrin could win the case." (Exh. PB-1 at ¶ 16).

 Much of the cross examination of Agent Smith at the detention hearing  sought to

establish that the weight of the evidence against Bergrin on these other "tampering" charges was

weak.  Indeed, Agent Smith conceded that he had no knowledge of which clients Bergrin urged

to kill witnesses; and in at least two instances, the "Loyal" case and the "Howard" case, he was

not specifically aware what Bergrin did wrong.  (<u>Id.</u> at ¶¶ 18a, b).  Instead, most of his

information on these other tampering allegations was based on hearsay; came from other agents,

who obtained them from confidential informants or assistant prosecutors in state court.  He could

provide little detail.  Other than Agent Smith, the government offered no other evidence

regarding the strength of the other tampering counts.

While the court finds that the evidence proffered at the detention hearing on the tampering charges was not strong, the court reaches a different conclusion with the respect to the most serious charges: the Baskerville murder and the Esteves attempted murder. With respect to the Baskerville murder, the government relied on the sworn trial testimony of government witness Young, who made clear that Bergrin gave the directive to murder Kemo: "If somebody was to testify against [Baskerville] . . . and if we didn't get rid of that person, that Will Baskerville would never see the streets again in his life." (Exh. PB-2 at 4360:11-14). Bergrin further explained that "if there was no Kemo to testify against Will, there would be no case." (Id. at 4361:1-2). At the detention hearing, the defendant could not seriously challenge the strength of this evidence, other than to point out the delay between the trial testimony (i.e., in 2007) and the indictment (i.e., in May 2009).

Thus, the case is unlike Torres-Rosario v. United States, 600 F. Supp. 2d 327, 333 (D.P.R. 2009), where the court granted bail in a murder case where the single eyewitness to the murder could not even identify the defendant in the court room. ("[T]he evidentiary weight has tipped almost completely to the defendant's side of the scale: there remains little evidence supporting the government's case against Mr. Torres, and what evidence there is on the record is mainly exculpatory.") It is also plainly distinguishable from United States v. Jones, 583 F. Supp. 2d 513, 516 (S.D.N.Y. 2008), where the court found that the evidence against the defendant was so weak that it overcame the presumption of detention, where documentary evidence and five witnesses contradicted the government's one unidentified witness. Id. at 515-16. Here, no such evidence was put before the Court to challenge the testimony of Young proffered in support of

the murder charges against Bergrin.

An even stronger conclusion can be reached with respect to the evidence in connection with the Esteves attempted murder. The government proffered a summary of tape-recorded conversations between the confidential information and Bergrin. The excerpted testimony is clear and unambiguous. The direct quotation bears repeating here:

> BERGRIN: [P]ut on a ski mask and make it look like a robbery and take all the money in the house.
>
> CONFIDENTIAL INFORMANT: But listen to me, listen to me....
>
> BERGRIN: No, but we can make it look like a robbery. It cannot under any circumstances look like a hit.
>
> CONFIDENTIAL INFORMANT: Hmm, smart. I was saying fuck his money, I got money.
>
> BERGRIN: "No, I'm not worried about the money, but make it look like a home invasion robbery. . . (pauses) We have to hit him when the girlfriend is at work. . . ."

(Exh. PB 1-A at 15).

Bergrin did not seriously challenge the strength of the evidence on this charge. Indeed, his only arguments were that the tape reflected only a partial excerpt; and that six months elapsed since the conversation took place in December 2008 and the grand jury's return of the indictment in May 2009, and no further action was taken by Bergrin in furtherance of the murder conspiracy.[2] Those arguments, however, do not seriously call into question the strength of the evidence on this charge. Cf United States v. Schenberger, 498 F. Supp. 2d 738 (D.N.J. 2007)

---

[2] Initially, during the first day of the detention hearing, Bergrin also argued that the alleged victim, Junior the Panamanian, was incarcerated at the time of the December 2008, conversation. On the second day of the hearing, the government countered that Junior the Panamanian was not incarcerated until March 2009. Bergrin did not challenge that fact.

(weight of evidence strong where it included transcriptions of defendant's communications with undercover agent).

### (3) History and Characteristics of the Defendant

The third factor this Court must examine in its detention analysis is the history and characteristics of the defendant. The Court must consider:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; . . . .

18 U.S.C. § 3142(g)(3)(A),(B).

Here, Bergrin has demonstrated significant and long-standing ties to the community. He, along with his wife and child, are long-term residents of New Jersey. He owns property in New Jersey. He served in the military. Moreover, Bergrin has spent the majority of his professional career as a prosecutor in New Jersey and in private practice in this State.

However, the Court must also consider defendant's criminal history. In January 2007, Bergrin was charged in New York with, among other things, money laundering and conspiracy to promote prostitution in violation of New York's state criminal laws. Bergrin was released on $1,000,000 cash bail. While on pretrial release in that case, the indictment alleges that Bergrin plotted to kill witnesses in the Esteves case.

### (4) Nature and Seriousness of the Danger to Any Person or the Community

The fourth factor that the Court must examine is the nature and seriousness of the danger to any person or the community if defendant is released.   As set forth above, the government has proffered substantial evidence that Bergrin has been involved in the murder and an attempted murder of government witnesses– motivated by his desire to achieve favorable outcomes for his clients in their criminal cases.   In addition, the indictment refers to other examples of witnesses tampering. When coupled with the more serious murder charge and attempted murder charge, it presents a calculated and pervasive pattern of criminal activity.

Courts have consistently found danger to the community sufficient to warrant detention where, as here, a defendant has threatened and intimidated witnesses – even where the charges do not include capital murder.  See e.g., United States v. Delker, 757 F. 2d 1390, 1400 (3d Cir. 1985) (finding clear and convincing evidence of danger to the community where indictment details use of "force, violence, vandalism and physical and economic intimidation"); United States v. Robertson, no. 08-cr-065, 2009 WL 1064946, * 3-4 (D.D.C. Apr. 20, 2009) (based on evidence of defendants' witness tampering and fabrication of evidence, court concluded that government demonstrated clearly and convincingly that to release "any one of these defendants into the community prior to trial, under any condition, would pose a gave and unacceptable risk of continued obstruction of justice.");

Defendant argues that the community will not be endangered if he is released because he will be subject to home confinement and electronic monitoring, will remove cell phones and computers from the home, will allow the government to monitor his visitors, will engage the services of a private security firm to randomly inspect his home and have his wife serve as third party custodian.  The Court notes that Bergrin's agreement to prohibit his use or access to a

computer is a difficult condition of release to enforce. "The ubiquitous presence of the internet and the all-encompassing nature of the information it contains are too obvious to require extensive citation or discussion." United States v. Voelker, 489 F.3d 139, 145 (3d Cir. 2007). Defendant also argues that his substantial family and community ties demonstrates that he is not a danger to the community. Finally, he argues the government cannot show, by clear and convincing evidence, that, with such restrictions, that defendant presents a danger to the community.

Despite arguments to the contrary, the court is satisfied that the government has met its burden, and the conditions proffered will not ensure the safety of the community. The evidence proffered in support of the Baskerville murder and the Esteves attempted murder makes clear that defendant accomplished these crimes through conversations and meetings – by directing others to murder witnesses. See, e.g., United States v. Ferranti, 66 F.3d 540, 544 (2d Cir. 1995). Placing Bergrin under even the most stringent house arrest does not address this harm and does not minimize the very real possibility that further similar criminal conduct could be carried out from home. These conditions would do no more than "elaborately replicate a detention facility without the confidence of security such a facility instills." United States v. Gotti, 776 F. Supp. 666, 672 (E.D.N.Y. 1991). See, e.g., United States v. Orena, 986 F.2d 628,632-33 (2d Cir. 1993) (in organized crime RICO case, Second Circuit found combined $ 4 million bail package for both defendants secured by family homes and property; home confinement, restricted visitation and phone calls and consent to government searches insufficient to address dangerousness).

It is also relevant to the analysis that Bergrin was on pretrial release based on $1,000,000 bail in connection with state court charges in New York when he allegedly engaged in the

conspiracy to murder in the <u>Esteves</u> case. Plainly, he did not abide by his conditions of release. The court has no assurance that he will not refrain from criminal conduct if released. The stakes now are even higher, given that his own liberty is at issue.

      D.     <u>Defendant's Risk of Flight</u>

As to defendant's risk of flight, this is a closer call. Defendant argues that given his ties to the community, his posting of his family homes as collateral, his wife and other family members service as third party custodians, his proposed home confinement and electronic monitoring and monitoring by a security firm, he is not a flight risk. This court disagrees.

As a threshold matter, it is well settled that electronic monitoring, use of GPS device and home detention do not guarantee against flight. "Electronic monitoring impedes but does not prevent a defendant from fleeing." <u>Abdullahu</u>, 488 F. Supp. 2d at 444; <u>see</u> <u>also</u> <u>Gotti</u>, 766 F. Supp. at 672-73. It is also clear that "courts have given considerable weight to the prospect of the death penalty in assessing whether a defendant has an incentive to flee." <u>United States v. Eischeid</u>, 315 F. Supp. 2d 1033, 1037 (D. Az. 2003). Courts also consider the nature and circumstances of the offense, family ties, employment status and financial resources, the defendant's character and mental condition and any prior record. <u>See</u> <u>United States v. Bissell</u>, 954 F. Supp. 903, 907 (D.N.J. 1997). Courts also examine "whether a defendant has substantial foreign ties and has access to considerable funds to finance flight from the jurisdiction." <u>United States v. Giordano</u>, 370 F. Supp. 2d 1256, 1264 (S.D. Fl. 2005). Another relevant factor is hidden assets. <u>Id</u>.

Here, at the detention hearing, much testimony was elicited about the extent of Bergrin's hidden assets. In his certification, Smith stated, based on information from confidential

informants that Bergen has "significant assets hidden in bank accounts overseas." (Exh. PB-1 at ¶ 29). On cross-examination, however, he conceded that he had no personal knowledge of any money held by Bergrin in overseas accounts. He was also unaware of any recent travel of Bergrin abroad.

Agent Smith, however, did point to three checks that Bergrin received: a Nov. 25, 2005 check from a Gary Bootes in the amount of $135,800 with a note indicating it was for the "closing of 82 Hazelwood," which check was endorsed over to his wife for deposit; a June 13, 2005 check from an attorney trust account to Premium Realty Investment Corp (an entity owned by Bergrin) in the amount of $125,664;[3] and a June 24, 2004 attorney trust account check in the amount of $53,657 payable to Abdul Jenkins, noting "Bal. Proceeds of sale," endorsed over to Mrs. Bergrin. (Exh. PB-4). Agent Smith pointed out that Bergrin had no ties to either of the two properties referenced on the check. Smith also detailed that proceeds from a sale of property in Newark, NJ on June 13, 2005, in the amount of $125,664 were not reported to the IRS by Bergrin. (Exh. PB-1 at ¶ 32).

Defendant argues that there is no evidence that such money from the three checks was illegal proceeds or hidden assets. However, defendant proffered no explanation for the checks or the properties referenced on the checks. Why were such attorney trust account checks in large amounts endorsed over to Mrs. Bergrin? Why did they reference the properties when there was no evidence proffered that the Bergrins had any ties to the properties? Why was over $300,000

---

[3] The indictment alleges that Premium Realty Investment Corp., owned by Bergrin, was a conduit for assisting the criminal enterprise. (Indictment, Count I). It also alleges illegal wire transfers to banks and lenders at or about the same time the checks were deposited. (Indictment, Count 9).

in ostensible real estate proceeds paid over to defendant and his wife?  He also offered no explanation for the June 13, 2005 proceeds which were hidden from the government.

Although the checks are dated over four years ago, they nonetheless demonstrate Bergrin's access to considerable funds.  Indeed, in addition to that money, Bergrin also reports a home in Morganville, NJ, a home in Monmouth Beach, NJ and a condominium in Florida with a collective estimated equity of over $1,000,000.  He also reported liquid assets of approximately $700,000.  Thus, this case is similar to those cases where the courts ordered detention based, in part, on a finding that the defendants had a significant incentive to flee given access their to substantial financial assets.  See, e.g., United States v. Kimoto, no. 07-cr-30089, at * 3 (S.D. Ill. Oct. 6, 2008);  United States v. Burstyn, no. 04-cr-60279, 2005 WL 2297605, at * 5 (S.D. Fla. Mar. 18, 2005); United States v. Halloran, no. 86-cr-245, 1989 WL 2691, * 3 (S.D.N.Y. Jan. 11, 1989).

Given the capital charges defendant faces here, coupled with his access to considerable funds, the court is satisfied that the government has established , by a preponderance of the evidence, that defendant is a flight risk.  The court also notes Bergrin's extensive knowledge of criminal law and procedure.  It is not far-fetched to believe that this knowledge will enable defendant to avoid detection if he flees.  See United States v. Abad, 350 F.3d 793, 800 (8th Cir.2003) (citations omitted) (reversing the District Judge's decision granting defendant bail and noting, *inter alia,* the ease of travel to Mexico and Canada. Also noting home detention, family assurances and electronic monitoring are not sufficient to justify bail in view of strong evidence that the defendant presented a risk of flight and danger to the community).

### III.  CONCLUSION

After reviewing the totality of the evidence, and for the reasons set forth above, upon considering the four factors set forth in the Bail Reform Act, the court concludes that the government has proven, by clear and convincing evidence,  that no conditions or combination of conditions exist that will reasonably ensure the safety of the community.  The government presented strong, unambiguous evidence to support the charges related to the Baskerville murder and the Esteves attempted murder.  The serious nature of the charges, allegedly committed while defendant was on bail, militates strongly in favor of detention.  Similarly, the court concludes that the government has proven, by a preponderance of the evidence, that no condition or combination of conditions exist that will reasonably assure defendant's appearance at trial.  The fact that defendant is potentially facing the death penalty, coupled with his access to substantial resources, and his knowledge of the criminal justice system, demonstrates that he is a flight risk.

**SO ORDERED**.

*s/ Madeline Cox Arleo*
Madeline Cox Arleo
United States Magistrate Judge


Dated:  May 29, 2009

cc:     Hon. William J. Martini, U.S.D.J.
         Clerk of the Court
         Parties