UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>PAUL W. BERGRIN, *et al.*<br><br>Defendants. | Criminal No. 09-369<br><br>OPINION |

This matter comes before the Court on Defendant Paul Bergrin's Second Omnibus Motion seeking various forms of pretrial relief, including severance of offenses under Federal Rule of Criminal Procedure 14. This Opinion focuses solely on the issue of severance.[1] The Court finds that a joint trial of every offense in the Second Superseding Indictment (the "SSI") poses a serious risk of preventing the jury from making a reliable judgment as to Begrin's guilt or innocence with respect to Counts Twelve and Thirteen, which charge Bergrin with murdering a witness and conspiracy to commit such murder, in violation of 18 U.S.C. § 1512(k) and 18 U.S.C. §§ 1512(a)(1)(A), 1512 (a)(3)(A), and 2 (the "K.D.M. Counts"). As explained below, this serious risk compels the Court to sever those Counts from the rest of the SSI and order two separate trials.

I.  **Background**

On June 2, 2011, the Grand Jury in and for the District of New Jersey charged Bergrin, an attorney, with racketeering, in violation of 18 U.S.C. § 1962(c), racketeering conspiracy, in violation of 21 U.S.C. § 846, violent crimes in aid of racketeering (the "RICO Counts"), and various other federal offenses, including tax evasion, prostitution, drug crimes, witness tampering, and the afore-mentioned murder. The Thirty-Three-Count SSI charges these other federal offenses both as predicate acts in furtherance of the RICO Counts and in parallel substantive counts. At the heart of the SSI are the RICO conspiracy count, which charges the existence of an ongoing criminal enterprise running from November 2001 until May 21, 2009, and Count Five, which charges a conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846, which allegedly existed from sometime in 2003 until May 21, 2009. As part of the manner and means of those conspiracies,

---

[1] The Court's September 19, 2011 Opinion deals with the remaining issues from the Second Omnibus Motion.

the SSI charges that in late 2003 and early 2004, Bergrin and others conspired to murder – and successfully murdered – K.D.M., a witness against W.B., a member of a drug trafficking organization that was a customer of Bergrin's criminal organization. Also in furtherance of the conspiracies, the SSI charges that in 2008, Bergrin and others conspired to murder "Junior the Panamanian," a witness against V.E., one of Bergrin's clients. The SSI also charges the Junior murder conspiracy separately from the drug conspiracy as Counts Twenty through Twenty-Five.

## II.  Severance Analysis

### A.  The Rule 14 Standard

Federal Rule of Criminal Procedure 14 provides that even where joinder is proper under Rule 8, "[i]f the joinder of offenses . . . appears to prejudice a defendant or the Government, the court may order separate trials of counts . . . or provide any other relief that justice requires." *See also Zafiro v. United States*, 506 U.S. 534, 537-38 (1993). The proper "tailoring of the relief to be granted, if any, [is left] to the district court's sound discretion," *Zafiro*, 506 U.S. at 538, and will not be disturbed on appeal, absent a showing that the district court abused its discretion. *United States v. Davis*, 397 F.3d 173, 182 (3d Cir. 2005). But the mere appearance of prejudice is insufficient to justify severance. Trial courts should only grant severance in those cases where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment of guilt or innocence." *Zafiro*, 506 U.S. at 538; *United States v. Silveus*, 542 F.3d 993, 1005-1006 (3d Cir. 2008).

### B.  The Risk of Prejudice

The Government seeks to try all thirty-three Counts in one joint trial. Bergrin concedes that because of the inclusion of the RICO charges joinder of all of the offenses is technically proper under Federal Rule of Criminal Procedure 8. But Bergrin still argues that severance is necessary under Rule 14 because a joint trial would unavoidably prejudice him. Specifically, Bergin argues that the jury would hear evidence relating to all thirty-three Counts, and therefore certain evidence relating to one or more counts would cause the jury to infer Bergrin's guilt as to separate and factually unrelated counts. *See, e.g.*, *United States v. Lore*, 430 F.3d 190, 204-05 (3d Cir. 2005) (discussing alleged risk of prejudicial spillover evidence); *United States v. Adams*, 759 F.2d 1099, 1112-13 (3d Cir. 1985) (discussing alleged risk of prejudicial spillover evidence); *United States v. Newmark*, 2008 WL 2165093, at *4-5 (E.D. Pa. May 22, 2008) (same); *United*

*States v. James*, 2008 WL 370921, at *8 (D.N.J. Feb. 11, 2008) (same). The Court must look at the specific risks of prejudice to determine if severance is proper under Rule 14, and, if so, how it will try the case.

The most substantial risk of unacceptable prejudice – and the risk that most troubles the Court – is the risk that the jury will find Bergrin guilty of murdering and conspiring to murder K.D.M. in late 2003 and early 2004 based on evidence of Bergrin's involvement in the conspiracy to murder Junior the Panamanian in 2008. The disparity in the likely evidence the Government will offer for both conspiracies highlights the inherent dangers. The Government proffers that it will introduce evidence, including audio recordings, showing that in 2008 Bergrin had conversations with a confidential informant – dubbed by the Government as "the Hitman" – during which Bergrin explicitly discussed killing Junior the Panamanian and instructed the Hitman to make the murder look like a home invasion robbery. By contrast, the Government's proffered evidence regarding the K.D.M. murder is much more circumstantial. The Government intends to prove that Bergrin said the words "no Kemo, no case" to certain other persons and that by uttering these words Bergrin specifically intended to cause those individuals to murder K.D.M. to keep him from testifying. And although the Government has a variety of evidence specifically probative of the K.D.M. Counts it intends to introduce, the evidence will likely be nowhere near as overwhelming as the evidence relating to the Junior murder.

Concerns about spillover prejudice are common in trials involving joinder of numerous offenses. But the chief tool trial courts use to mitigate this prejudice is the providing of limiting instructions. And for most cases, limiting instructions are sufficient. *See, e.g.*, *See United States v. Riley*, 621 F.3d 312, 335 (3d Cir. 2010) (affirming denial of severance where district court gave limiting instructions to mitigate spillover evidence); *Lore*, 430 F.3d at 205 (same). Indeed, limiting instructions might be sufficient to mitigate the danger of prejudice being caused by spillover of evidence as between many of the substantive counts. For example, the Court may instruct the jury that it should not consider certain evidence relating to the prostitution counts for the purposes of determining Bergrin's guilt regarding the drug conspiracy counts. And because there is nothing specifically technical or confusing about these crimes, the Court has confidence that the jury would be able to follow such instructions. *See Lore*, 430 F.3d at 205.

But in considering Bergrin's guilt for the K.D.M. Counts, any limiting instructions would likely be insufficient. It would be perhaps unavoidable – and merely human – for the jury to use the direct, explicit evidence from the Junior murder conspiracy case to infer Bergrin's guilt of the K.D.M. Counts regardless of any limiting instruction. That is, the Court recognizes that it cannot reasonably expect jurors to compartmentalize this evidence due to the similar nature of the

3

charges and the disparity of the level of evidence as to each. *United States v. Davis*, 397 F.3d 173, 182 (3d Cir. 2005) (holding that relevant inquiry is whether district court could reasonably expect jury to compartmentalize evidence). This potential prejudice is so severe that it presents a serious risk that joinder would prevent the jury from making a reliable judgment as to the K.D.M. Counts. And although he is charged with a variety of crimes, the stakes on the K.D.M. Counts are especially high for Bergrin: if a jury finds him guilty on those counts, he faces a mandatory life sentence.

And while this threat of prejudice is alone sufficient to justify severance, the inclusion of the RICO Counts compounds the problem. While it makes no final determination, the Court recognizes that the jury would likely hear instructions requiring them to parse evidence of substantive criminal actions from evidence of predicate acts. Given the particular structure and factual allegations of the SSI, this task could be arduous even without the threat of spillover evidence as between the murder conspiracy counts. But the combination of all the counts, as charged in the SSI, greatly magnifies the risk of prejudicial spillover.

This finding, barring other considerations, would compel the Court to sever the charged offenses in such a way as to prevent this prejudicial spillover of evidence from the Junior murder conspiracy to the K.D.M. murder conspiracy. Bergrin proposes that the Court try the offenses in six separate phases organized by substantive scheme: (1) the RICO counts; (2) the K.D.M. murder counts; (3) the drug and drug conspiracy counts; (4) the prostitution counts; (5) the Junior murder conspiracy counts; and (6) the tax counts. This plan, while theoretically neat and tidy, ignores the structure of the SSI, which ties all of these schemes together as part of the RICO Counts and many of them as part of the drug conspiracy. And it goes far beyond what is necessary under Rule 14; as this Court has already noted, once the K.D.M. Counts are severed, limiting instructions will mitigate any risk of prejudice caused by spillover evidence between these other counts. Again, absent the serious risks discussed above, the Government would have the right to try all of these multitudinous offenses at one time in light of the alleged racketeering enterprise. *See, e.g.*, *United States v. Giampa*, 904 F. Supp. 235, 266 (D.N.J. 1995) (citing cases). The simplest solution – and the one that will risk the least waste of judicial and party resources – is for the Court to sever only the K.D.M. Counts and order that they be tried separately.

### III. The Government's Arguments Against Severance

The Government argues that severance is inappropriate for a variety of reasons, including that it would be a waste of judicial resources, it would present increased danger for witnesses, and that regardless of the severance plan the Court

4

adopted, all or most of the evidence of the related crimes would be admissible at all of the severed trials. Indeed, the Government's argues that even if the K.D.M. Counts were tried separately, evidence regarding the Junior murder conspiracy would be admissible at that trial under Federal Rule of Evidence 404(b), and therefore severance would be unwarranted. *See, e.g.*, *Rodriguez v. United States*, 2011 WL 3328519, at *4 (D.N.J. Aug. 1, 2011) (citing *United States v. Deluca*, 137 F.3d 24, 36 (1st Cir. 1996)); *Dolbin v. United States*, 2010 WL 1904528, at *7 (M.D. Pa. May 11, 2010).

The Court disagrees. While the Court will likely allow certain other Rule 404(b) evidence into the separate trial on the K.D.M. Counts, Rule 404(b) does not compel the Court to allow admission of the vast majority of the Junior murder conspiracy evidence. And the Government's other arguments against severance are similarly insufficient to sway the Court's decision.

### A. Other Crimes Evidence

Under Federal Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." That is, Rule 404(b) specifically excludes from admissibility evidence offered to prove a defendant's propensity to commit criminal acts. *United States v. Green*, 617 F.3d 233, 249-250 (3d Cir. 2010). To be admissible under Rule 404(b), evidence of uncharged cries or wrong must: (1) have a proper evidentiary purpose; (2) be relevant; (3) satisfy Rule 403; and (4) be accompanied by a limiting instruction, where requested, about the purpose for which the jury may consider it. *United States v. Kellogg*, 510 F.3d 188, 199 n. 10 (3d Cir. 2007) (citing *Huddleston v. United States*, 485 U.S. 681 (1988)).

The Government avers that in a separate trial on the K.D.M. Counts much of the evidence tending to prove the various other charges of the SSI would be admissible under Rule 404(b) and other evidentiary principles.[2] For example, the Government argues that evidence regarding the drug conspiracy could be relevant because the Government intends to prove that Bergrin wanted K.D.M. to be killed not just to protect his client, who was facing prosecution, but to protect the drug business of which he was a part. On this evidence the Government is correct: some evidence regarding the drug conspiracy as it existed around the time of the K.D.M. murder conspiracy will likely be relevant and admissible to prove Bergrin's motive. *See* F.R.E. 404(b) (stating that proper purposes include, among other things, "proof of motive"); *United States v. Lee*, 612 F.3d 170, 189-90 (3d Cir.

---

[2] At the request of the Court, the Government provided a thorough proffer of all of the Rule 404(b) evidence it might seek to introduce at a separate trial on the K.D.M. Counts. The Court considered this proffer – and the parties' briefing regarding it – in deciding the motion for severance.

5

2010) (holding evidence offered for proper purpose of determining motive under Rule 404(b)). Similarly, and depending upon the specifics of the Government's proffer, evidence of other witness tampering plots in which Bergrin may have been involved before or around the same time as the K.D.M. murder conspiracy could be admissible under Rule 404(b) to show Bergrin's intent. The Government may also be able to introduce a very limited amount of evidence regarding later criminal acts charged in the SSI to provide credibility to certain other witnesses who will testify to later discussions they had with Bergrin in which he made certain admissions or statements about the K.D.M. murder. *See, e.g.*, *United States v. Butch*, 48 F. Supp. 2d 453, 459-60 (D.N.J. 1999) (admitting other-crimes evidence under Rule 404(b) to provide necessary background information to explain relationship of defendants and witness). Of course, the Court will decide all of these issues on case-by-case basis after considering the Government's proffers and any objections from Bergrin. But the Government is correct that the Court will allow it to introduce some evidence of other acts charged or alleged in the SSI that are not directly relevant to the K.D.M. Counts.

But the Court finds it highly unlikely that much of the evidence regarding the Junior murder conspiracy would be admissible. The Government argues that such evidence would be relevant to show, among other things, that Bergrin acted with specific intent of conspiring with other persons to kill K.D.M. They argue that the evidence is highly probative because they believe that the issue of Bergrin's intent will be one of the central issues at trial. But the Court finds these arguments unpersuasive.

The other-crime evidence most typically admitted under Rule 404(b) falls into the general category of "prior bad acts." That is, they are acts the accused has allegedly engaged in prior to the acts for which he is charged and standing trial. But here, because the Junior murder conspiracy happened more than four years after the K.D.M. murder conspiracy, the evidence surrounding the Junior murder conspiracy would be a *subsequent* criminal act. While the Government is correct that there is no *per se* bar to subsequent act evidence, *United States v. Echeverri*, 854 F.2d 638, 645 (3d Cir. 1988) ("We do not dispute that there may be cases in which evidence of subsequent wrongful acts may properly be admitted under Rule 404(b)."), that does not mean that evidence of a subsequent act is permissible or relevant in the same way that evidence of a prior bad act may be.

The Court recognizes that, generally speaking, the appropriate analysis for determining the admissibility of all other act evidence is the same – regardless of whether it is evidence of subsequent or prior acts. But when evidence of subsequent acts passes through that analytical process, it does not necessarily hold up as well as prior acts may to prove certain issues. Take the issue of specific intent. The relevance of a prior act to specific intent is more obvious – if a person

has already committed an act and seen a particular consequence, then that individual would carry that knowledge and experience forward in life, knowing that if they undertook the specific act again then the same consequence or a similar consequence would likely occur. Here, the operative mechanism is memory: we see something, and we learn and remember.

But to impute knowledge or intent from subsequent acts requires a less defensible inferential leap. The fact finder must assume that because a person acted expecting or intending a certain consequence at a later date, he intended that same consequence to occur when he took that same act some time before, without an obvious mechanism of why that should be. Instead, it looks more like evidence that is being offered to show that the accused is a "bad guy," someone with the propensity to commit criminal acts. He did it in 2008, so he must have done it in 2004. But this is of course the exact purpose for which other act evidence under Rule 404(b) is impermissible. And this is in part why the Third Circuit has expressed its skepticism of the value of subsequent acts to prove intent and knowledge: "[t]he logic of showing prior intent or knowledge by proof of subsequent activity escapes us." *United States v. Boyd*, 595 F.2d 120, 126 (3d Cir. 1978); *see also Echeverri*, 854 F.3d at 645 ("[T]he presence of cocaine in Echeverri's Los Angeles apartment 18 months after the termination of the alleged conspiracy and four years after the last overt act of which there was direct evidence was clearly no more probative of the knowledge and intent of the alleged co-conspirators during the relevant period than were the drug negotiations in *Boyd*."). And this is why the Court, here, is skeptical of the probative value of allowing the Junior murder conspiracy evidence – which, again, happened more than four years later – into a separate trial on the K.D.M. Counts.

The cases the Government offers in support of the propriety of subsequent act evidence are distinguishable. *United States v. Simpson*, 479 F.3d 492 (7th Cir. 2007), is about using similarity in criminal acts to prove identity where identity is at issue; identity is not at issue here. *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), is also inapposite. In *Rutoske*, the defendant did not even challenge whether the evidence was being introduced for a proper purpose but instead focused on whether the evidence was relevant and whether its probative value outweighed any prejudicial effect. *Id.* at 177. And in that case, the substantial similarity between the charged act and the subsequent act – both of which involved very particular stock manipulation schemes – made the evidence highly relevant to rebut the defendant's assertion that he did not understand or did not approve of the charged scheme. *Id. United States v. Thomas*, 593 F.3d 752 (8th Cir. 2010), is less than persuasive because it depends upon Eight Circuit jurisprudence regarding Rule 404(b) which deviates from controlling Third Circuit precedent because it focuses on the similarity of the crimes charged. *Compare Thomas*, 593 F.3d at 758

7

(discussing Rule 404(b) analysis under Eight Circuit precedence) *with Green*, 617 F.3d at 250 (discussing Rule 404(b) analysis under Third Circuit precedence). *United States v. Buhl*, 712 F. Supp. 53 (E.D. Pa. 1989), *aff'd* 899 F.2d 1219 (3d Cir. 2010) (table) is also of limited use here. In *Buhl*, not only did the subsequent act of kidnapping and sexual assault occur a mere five weeks after the charged conduct, the factual similarities of the attacks were nearly identical, and thus, highly probative to both the issue of whether the defendant acted with specific intent and to the issue of whether the victim consented to the encounter. *Id.* at 55-56.

Even *United States v. Ortiz*, 474 F.3d 976 (7th Cir. 2007), which at first blush appears partly convincing, does not persuade the Court that the evidence would be admissible. *Ortiz* is about how other-crimes evidence may sometimes be introduced to show a defendant's familiarity with "certain unusual linguistic usage." *Id.* at 981. Here, the Government intends to prove that Bergrin used the phrase "no witness, no case" or some variation thereof during his discussions with the Hitman in 2008. The Government argues that, under *Ortiz*, this evidence regarding the Junior murder conspiracy is therefore relevant in a trial on the K.D.M. Counts because it shows that when Bergrin said "no Kemo, no case" in 2003 or 2004, he was using this same code language to communicate that Kemo should be killed. But the Court is unconvinced. First, the model code language *Ortiz* mentions is more straightforward: for example, in discussing a deal to sell guns, the defendant would substitute the word "toy" in for the word "gun." *Id.* at 981. Here, the alleged code language is much less direct: the Government intends to prove that Bergrin used the phrase "no witness, no case" to subtly signal that a witness should be murdered. The alleged code phrase is also very generic. It strikes this Court as the kind of language that many a criminal defense attorney may use in trying to relate the key components of a legal situation to a client who has limited formal education. And second, the evidence at issue in *Ortiz* was evidence of *past* criminal acts, and thus *Ortiz* does little to stem the Court's skepticism of the probative value of subsequent-act evidence. *See id.* at 980.

Finally, the Third Circuit's opinion in *United States v. Crawford*, 376 F. App'x 185 (3d Cir. 2010) is not about evidence of subsequent acts but about evidence of other acts of an indeterminate time period that was discovered after the defendant was charged:

> "The mere fact that the evidence was recovered after the crime was alleged to have been committed does not settle the issue of whether the evidence is relevant. . . . Additionally, there is no evidence that the documents found in Crawford's business were *created* subsequent to the acts alleged in this case, only that

8

they were *discovered* after those acts." *Id.* at 188.

As such, it adds little to the discussion of the admissibility of the subsequent act evidence before the Court.

This Court acknowledges that some evidence of the Junior murder conspiracy will likely be admissible to provide the requisite background information to support testimony from two of the Government's intended witnesses. Both witnesses, T.M. and V.E., were formerly Bergrin's co-defendants, both were involved in the Junior murder conspiracy, both pled guilty to certain crimes relating to that conspiracy, and the Government has proffered that both will testify as to certain admissions Bergrin made in 2008 that are probative of his guilt on the K.D.M. Counts.

Because the proceedings have not yet begun, and because the Government's proffer regarding the testimony of these witnesses was somewhat general, the Court cannot yet determine exactly what evidence it will allow. But the Court will allow only the amount of evidence that is necessary to establish the credibility of the witnesses. *Butch*, 48 F. Supp. 2d at 459-60. Of course Bergin or his counsel will have to be careful when conducting cross-examination – if Bergrin opens the door, evidence that might otherwise be improper or unfairly prejudicial may come right in. But that risk turns on the actions of Bergrin or his counsel at trial, and so it does not weigh against the granting of severance.

Finally, as the Court has already noted, the risk of unfair prejudice is particularly high in this case. In light of this, the Court does not see how the majority of the evidence regarding the Junior murder conspiracy would be admissible under the third prong of Rule 404(b) analysis even it were technically available under the first. *See United States v. Himelwright*, 42 F.3d 777, 785 (3d Cir. 1994) (holding district court erred in admitting testimony that would otherwise be admissible under Rule 404(b) where risk of prejudice substantially outweighed its probative value). As such, the possible admission of that evidence does not weigh against severance.

### B. <u>Other Concerns</u>

The Government's other arguments do not weigh significantly against severance. The Government's concerns regarding witness safety are too vague. While the Court does not ignore the fact that Bergrin is charged with multiple acts of witness tampering – including murder – it is unclear which witnesses, if any, would be forced to testify at both trials. *Cf. United States v. Rivera*, 363 F. Supp. 2d 814, 826 (E.D. Va. 2005) (noting that protection of witnesses mitigated against severance because certain witnesses would otherwise have to testify multiple

times); *United States v. Castellano*, 610 F. Supp. 1359, 1411-12 (S.D.N.Y. 1985) (same). And even if there were such witnesses, there is no indication that Bergrin does not already know their identities. That is, the Government has merely raised the specter of witness safety and has not explained to the Court in any specific terms which witnesses would be placed in danger and why the Court's decision to hold two separate trials would magnify that danger.

And the Government's concerns regarding cumulative evidence are overblown. While the Court has indicated that some evidence would be admissible at both trials, this would not necessarily create a great deal of redundancy, and that potential for some inefficient use of judicial resources does not outweigh the Court's concerns over the serious risk posed by the spillover evidence. *See, e.g.*, *United States v. Desantis*, 802 F. Supp. 794, 802-03 (E.D.N.Y. 1992). And if the Court failed to sever, conviction resulted, and that conviction was overturned on appeal because joinder was improper, it could conceivably result in a greater drain of judicial resources than the two controlled trials the Court orders today.

### C. The Third Circuit's April 12, 2011 Opinion

Both Bergrin and the Government point in vain to the Third Circuit's April 12, 2011 Opinion to bolster their arguments regarding severance. *United States v. Bergrin*, --- F.3d ----, 2011 WL 1366388 (3d Cir. Apr. 12, 2011). In the Opinion, the Third Circuit reversed this Court's prior order dismissing the racketeering counts as alleged in the previous Superseding Indictment. But that Opinion has little bearing on the current issue before the Court. First of all, the Superseding Indictment has since been replaced with the similar but substantively different SSI, rendering moot any of the Third Circuit's dicta regarding the propriety of the previous indictment. But that aside, the Opinion does not make any particular ruling regarding severance under Rule 14. Rather, the Opinion mentions Rule 14 severance analysis merely to note that such analysis is inappropriate in determining dismissal of a count under Federal Rule of Criminal Procedure 12.[3] Instead, the issue of severance is left where it has always been: in this Court's discretion.

---

[3] *See id.* at *13 ("The Court again had a rational reason for discussing joinder and severance under Rules 8 and 14 of the Federal Rules of Criminal Procedure. The Government's indictment was somewhat unwieldy, charging all of the RICO and non-RICO defendants with all of the RICO counts and underlying substantive crimes. Faced with a handful of motions to sever, the Court needed to analyze these rules. The misstep that the Court made, however, is that it did not merely assess whether the RICO counts and defendants could be tried along with the non-RICO counts and defendants. Instead, it determined that the predicate crimes underlying the RICO counts could not all be joined in one trial without a RICO charge binding them together, and from that, it extrapolated that the predicates cannot establish a 'pattern of racketeering activity.' In this case, however, there was a RICO count, and the Supreme Court has interpreted 'pattern' such that it requires only 'relationship and continuity,' broadly construed.").

10

## IV. Conclusion

For the foregoing reasons, the Court grants Bergrin's motion to sever and orders that Counts Twelve and Thirteen be tried separately.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**