NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | **Hon. Dennis M. Cavanaugh** |
| | : | |
| v. | : | **OPINION** |
| | : | |
| PAUL W. BERGRIN | : | Crim. No. 09-369 (DMC) |
| | : | |
| Defendant. | : | |
| | : | |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

This matter comes before the Court upon the post-trial motions of Defendant Paul Bergrin ("Bergrin" or "Defendant") requesting that the Court: (1) vacate the verdict and enter a judgment of acquittal as to Counts Twelve, Thirteen, One (Racketeering Act Four), and Three of the Second Superseding Indictment pursuant to Federal Rule of Criminal Procedure 29(c); (2) vacate the verdict and enter a judgment of acquittal as to Counts Twenty-Six and One (Racketeering Act Eight) pursuant to Rule 29(c); (3) grant a new trial on all counts pursuant to Federal Rule of Criminal Procedure 33; and (4) interview the members of the jury, pursuant to Federal Rule of Evidence 606(b) and Local Criminal Rule 24.1(g) regarding whether any or all of the jurors were exposed to extraneous prejudicial information or outside influence prior to the delivery of the verdict.   (Def. Post-Trial Mot. Br. ("Def. Br."), May 16, 2013, ECF No. 555-1).   After considering the submissions of the parties, and based upon the following, it is the finding of this Court that Defendant's post-trial motions are **denied**.

# I. <u>BACKGROUND</u>[1]

On June 2, 2011, a federal grand jury in this District returned a thirty-three count Second Superseding Indictment ("Second Superseding Indictment") in this matter, thirty of the counts pertaining to Bergrin.   The Indictment charges an array of criminal activity, ranging from conspiracy to murder a Government witness and witness tampering, to tax fraud and drug conspiracy.   These varied charges were laid out by the Government schematically, under the umbrella of the Racketeering Influenced and Corrupt Organizations statute ("RICO").   As discussed herein, the Second Superseding Indictment alleges that Bergrin led "The Bergrin Law Enterprise" and committed the charged criminal acts in conjunction with the other members of his Enterprise.

On September 19, 2011, the Honorable William J. Martini, over objection by the Government, severed Counts Twelve and Thirteen and ordered those counts to be tried separately. On November 23, 2011, Judge Martini granted a mistrial after the jury failed to reach a unanimous decision.   (ECF No. 338).   Subsequently, on November 30, 2011, the Government appealed to an oral order by Judge Martini excluding from the retrial on Counts Twelve and Thirteen evidence supporting the Pozo and Esteves plots.   (ECF No. 343).   That same day, Bergrin moved for a judgment of acquittal under FED. R. CRIM. P. 29(c).   (ECF No. 342).   Judge Martini denied Bergrin's motion for acquittal.   (ECF Nos. 373, 374).

On June 15, 2012, the Third Circuit vacated the order excluding evidence of the Pozo Plot, directed the reassignment of this matter, and instructed that the challenged evidentiary rulings and the severance issue be reconsidered by the newly assigned judge.   See <u>United States v. Bergrin</u>,

---

[1] The facts in this matter are lengthy and well-known to the parties.   Contained herein is a brief synopsis of the procedural background taken from the parties' respective submissions.

682 F.3d 261 (3d Cir. 2012).   Chief Judge Simandle reassigned the case to this Court.   (ECF No. 377).

Pre-trial the Government moved to try Counts One through Twenty-Six in a single trial and to admit evidence of the Pozo Plot and Esteves Plot to prove the McCray murder charged in Counts Twelve and Thirteen.   (ECF No. 381).   Bergrin again moved to sever Counts Twelve and Thirteen and opposed admission of the aforementioned evidence.   After oral arguments were heard on September 12, 2012, this Court denied Defendant's motion and granted the Government's motion.   Jury selection for trial on twenty-three of the charges began on January 7, 2013.   After the conclusion of trial, on March 18, 2013, the jury returned a unanimous verdict of guilty on all counts.

## II.   LEGAL STANDARD

When considering a motion for judgment of acquittal made pursuant to FED. R. CRIM. P. 29, a district court "must review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."   United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (internal citations omitted).   "When sufficiency of the evidence at trial is challenged, the Court must affirm if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt and if the verdict is supported by substantial evidence."   United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006).   The prosecution is entitled to prove this "entirely through circumstantial evidence."   Id.   "A finding of insufficiency should be confined to cases where the prosecution's failure is clear."   Brodie, 403 F.3d at 133 (internal citations omitted).   "Therefore, '[a] defendant challenging the sufficiency of the evidence bears a heavy burden.'"   United States

v. Delle Donna, Crim. No. 07-784, 2008 WL 3821774, at * 1–2 (D.N.J. Aug.12, 2008) (citing United States v. Casper, 956 F.2d 416, 421 (3d Cir. 1992)).

"[T]he trial court's ruling on the sufficiency of the evidence is governed by strict principles of deference to a jury's findings." United States v. Ashfield, 735 F.2d 101, 106 (3d Cir. 1984). This Court's "task is not to decide what [it] would conclude had [it] been the finder of fact; instead, [it is] limited to determining whether the conclusion chosen by the factfinders was permissible." Id. "Courts must be ever vigilant in the context of FED. R. CRIM. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." Brodie, 403 F.3d at 133. This Court "must view the evidence in the light most favorable to the jury verdict and presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." United States v. Iafelice, 978 F.2d 92, 94 (3d Cir.1992). "Indeed, 'all reasonable inferences must be drawn and all credibility issues resolved in the government's favor.'" Delle Donna, 2008 WL 3821774, at *2 (citing United States v. Scanzello, 832 F.2d 18, 21 (3d Cir. 1987)). "In assessing the sufficiency of the evidence, this Court must consider the totality of the circumstances, and must examine all of the evidence presented by the Government taken as a whole, and not consider pieces of the evidence in isolation." Delle Donna, 2008 WL 3821774, at *2 (internal citations omitted).

## III. DISCUSSION

### A. Motion for Judgment of Acquittal on Counts Twelve and Thirteen

Bergrin argues that, as a matter of law, there is insufficient evidence to support the jury's verdict on Counts Twelve and Thirteen, as well as the corresponding racketeering allegations charged in Counts One (Racketeering Act Four) and Three. (Def. Br. 16). Bergrin thus requests

4

that the Court enter a judgment of acquittal on those Counts pursuant to FED. R. CRIM. P. 29(c).

### 1. Sufficiency of Evidence to Sustain a Conviction for Count Twelve

Bergrin seeks a judgment of acquittal as to Count Twelve, charging him with conspiring with one or more persons to murder Kemo McCray ("McCray") to prevent McCray's testimony in an official proceeding, in violation of 18 U.S.C. § 1512(k). The jury was instructed with regard to Count Twelve that the Government was required to prove beyond a reasonable doubt:

> First, that two or more persons formed, reached, or entered into an unlawful agreement to murder Kemo McCray with the intent to prevent Mr. McCray's attendance or testimony at an official proceeding, and second, that at some time during the existence or life of that unlawful agreement, Defendant Bergrin knew that purpose of that agreement and intentionally joined it.

(Tr. 3/14/13 at 8883); <u>accord</u> Third Circuit Model Jury Instruction 6.18.371D. Bergrin avows that witness Anthony Young ("Young") provided the only testimony that connected Bergrin to the charged conspiracy to murder McCray. (Def. Br. 22). Young's testimony in part, included information about two conversations between Bergrin and Hakeem Curry ("Curry") on the afternoon of William Baskerville's ("Baskerville") arrest and one later in which Bergrin allegedly advised Curry, Young, Jamal Baskerville, Jamal McNeil, and Rakeem Baskerville (collectively "the Curry organization") that William Baskerville was facing life in prison and uttered the infamous phrase "No Kemo, no case." (Def. Br. 22). The defense argues, that even if this testimony is credited, no evidence exists that Bergrin knew the purpose of the agreement and intentionally joined it. (Def. Br. 22).

The Government points to the rejection of these starkly similar arguments in the preceding trial on this matter, wherein Judge Martini recognized "that the Government presented sufficient evidence from which a rational trier of fact could find Bergrin guilty of

conspiring to murder McCray" and "of aiding and abetting the murder of McCray beyond a reasonable doubt." United States v. Bergrin, Crim No. 09-369, 2012 WL 458426, at *5-6 (D.N.J. Feb. 10, 2012). The Government contends that Bergrin's assertion that no rational juror could conclude that he knew about and intentionally joined the conspiracy misstates the law and evidence. (Gov't Opp'n Br. 23). This Court agrees.

The Government was required to adduce legally sufficient evidence of: (1) an unlawful agreement to murder McCray to prevent his testimony at an official proceeding, and (2) Bergrin's knowledge of and intent to join that agreement to further its unlawful purpose. See United States v. Mastrangelo, 172 F.3d 288, 292 (3d Cir. 1999) (citation omitted). It is recognized that "illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract." United States v. McKee, 506 F.3d 225, 228 (3d Cir. 2007). In fact, "the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence." United States v. Brodie, 403 F.3d 123, 133-34 (3d Cir. 2005).

The law recognizes, and Bergrin does not dispute, that circumstantial evidence suffices to prove the elements of a conspiracy. See United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999). Bergrin acknowledges "the Curry [O]rganization's conspiracy to murder McCray." (Def. Br. 22). Further, the jury was presented with evidence that, on November 25, 2003, Bergrin, Hakeem Curry, William Baskerville, Rakeem Baskerville, and Anthony Young were involved in a conspiracy to distribute narcotics and that violent acts were undertaken in furtherance of that objective. (See, e.g., Tr. 1/22/13 at 185-223; Tr. 1/24/13 at 698-720, 725-59; Tr. 1/30/13 at 1519-52; Tr. 2/2/13 at 2215-31, 2061-73).

6

On that date, at William Baskerville's initial appearance after arrest on narcotics charges, Bergrin learned the identity of the informant against Baskerville and relayed the name "Kamo" to Hakeem Curry. Young, who was with Curry at the time of the call, realized Bergrin was referring to Kemo McCray. (Tr. 1/30/13 at 1573-75; Tr. 1/31/13 at 1886-87). Young testified that, after a December 4, 2003 bail hearing Bergrin attended with Baskerville, it was determined Baskerville faced a statutory sentencing exposure of ten years to life and an imposed Guideline range of 360 months to life. (Tr. 1/30/13 at 1576-77; Gov't Exh. 2218). Shortly thereafter, according to Young's testimony, Bergrin went to Avon Avenue and 17th Street to speak with members of the Curry organization, specifically Curry, Young, Rakeem Baskerville, Jamal Baskerville, and Jamal McNeil ("Avon Avenue Meeting"). (Tr. 2/1/13 at 2249-50). Testimony elicited from Young showed that Bergrin told the group that Baskerville "was facing life in prison for that little bit of cocaine" and "if no Kemo, no case." (Tr. 2/1/13 at 2252-53). The Court finds that Young's testimony alone allowed a rational jury to conclude that an illegal agreement to murder McCray was formed on November 25, 2003 between Baskerville and Bergrin, and that on December 4, Bergrin joined with members of the Curry organization to further the objectives of that agreement. Additional evidence reinforces a finding that the jury's inference in that regard was rational; for example, Vincente Esteves testified that when Bergrin was discussing the implications of Junior the Panamanian's potential testimony, Bergrin stated "if there's no witness, there's no case," and promised to "handle everything and that it wasn't his first time." (Tr. 2/22/13 at 5825-26). Esteves testified that he interpreted that exchange to mean that Bergrin was going to have Junior the Panamanian

killed and had arranged for the murder of witnesses in prior instances. (Tr. 2/22/13 at 5825-26).[2]

Taken as a whole, and viewed in the light most favorable to the Government, the foregoing evidence establishes that a jury could have rationally inferred that Bergrin knowingly and intentionally entered into a conspiracy to murder McCray to prevent his testimony at an official proceeding.[3]  "[A] written or spoken agreement among alleged co-conspirators is unnecessary; rather, indirect evidence of [a] mere tacit understanding will suffice."  United States v. Barr, 963 F.2d 641, 650 (3d Cir. 1992).  There was sufficient evidence to permit a rational juror to conclude that Bergrin knowingly and intentionally participated in the conspiracy charged in Count Twelve.

### 2.  Sufficiency of Evidence to Sustain a Conviction for Count Thirteen

Count Thirteen of the Second Superseding Indictment charges Bergrin with aiding and abetting the murder of McCray to prevent McCray's testimony in an official proceeding, in violation of 18 U.S.C. § 1512(a)(1)(A), (a)(3)(A) and Section 2.  (Second Superseding Indictment

---

[2] Testimony from Abdul Williams and Thomas Moran also bolsters this contention.

[3] In a series of letters filed after the parties' pleadings, the respective sides dispute the significance and content of two phone calls made on December 4, 2003.  (Gov't Letter, Jul. 1, 2013, ECF No. 560; Def. Letter, Jul. 3, 2013, ECF No. 561; Second Gov't Letter, Jul. 10, 2013, ECF No. 563; Def. Supp. Br., Jul. 15, 2013).  In his July 3, 2013 letter, Bergrin disputes that a rational jury could infer that the meeting about which Anthony Young testified occurred sometime after the December 4 bail hearing.  Bergrin later states that the Government "wrongfully asserts that they never suggested in their summation that the 7:13 p.m. phone call on December 4, 2003, was offered to show that the meetings occurred on that date" when in fact the Government "ardently argued and suggested to the jury, that December 4, 2003, was the date of the Bergrin meeting."  (Def. Supp. Br. 5).  Bergrin asserts that "the substance of the [December 4] calls themselves negates Young's account (which is, of course, the sole evidence of Mr. Bergrin's involvement in the Kemo McCray murder) . . . ."  (Def. July 3 Letter at 2).  The Government asserts that, were the content of the aforementioned calls as exculpatory as Bergrin claimed, he would have sought to use them at trial.  (Gov't July 10 Letter at 2).  The Court finds merit in this assertion and is not persuaded by Bergrin's countervailing argument that he opted not to use the recordings during trial because he "was intimidated by the Government attempting to deceive the jury, as they did anyway."  (Def. Supp. Br. 5).  The Court recognizes that, had Bergrin selected a sampling of the 33,000 intercepted calls, he would have exposed himself to admission of others.  Bergrin may not now, post-trial, seek the benefits of suppressible calls that he claims may be exculpatory while avoiding the content of many others that may have promoted a countervailing viewpoint.

at 97, ECF No. 213).

Pursuant to 18 U.S.C. § 2(a), a person who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). As the jury was instructed, to find Bergrin guilty, the Government was required to prove the following four elements beyond a reasonable doubt:

> First that someone committed each of the elements of the murder offense . . . ;
>
> Second, that Mr. Bergrin knew that someone was committing or was going to commit murder of Kemo McCray to prevent him from testifying at an official proceeding;
>
> Third, that Mr. Bergrin knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging another in committing that murder and with the intent that the murder be carried out;
>
> And, fourth, that Mr. Bergrin's acts did, in some way, aid, assist, facilitate, encourage, someone in murdering Kemo McCray;

(Tr. 3/14/13 at 8886-87); accord Third Circuit Model Criminal Jury Instruction 7.02.

Bergrin argues at the conclusion of the Government's case, it was clear that the second and fourth elements were not satisfied as a matter of law. (Def. Br. 34). Bergrin argues that Young's testimony did not support the assertion that the conspiracy participants discussed the scheme to murder McCray during the Avon Avenue Meeting with Bergrin, and instead that conversation occurred subsequent to Bergrin's departure. (See Def. Br. 34 (citing Tr. 2/1/13 at 2254-55)). Bergrin contends that there was no evidence that William Baskerville communicated to Bergrin that he wanted McCray killed. (See Def. Br. 34). Furthermore, Bergrin argues that, even if the jury was to deduce from Young's account of the Avon Avenue Meeting that Bergrin had knowledge of the Curry organization's scheme, the fourth element cannot be met because no evidence at trial demonstrated that Bergrin's acts did in fact assist or aid in the murder of McCray.

9

(Def. Br. 38 (citing <u>United States v. Nolan</u>, 718 F.2d 589, 592 (3d Cir. 1983)).   Bergrin opines

that the Government's case connecting Bergrin to the murder of McCray amounted to two pieces

of evidence, alone insufficient: (1) that Bergrin identified the informant as Kemo and; (2) told the

group at Avon Avenue Meeting that William Baskerville was facing life for four hand-to-hand

drug sales.   (<u>See</u> Tr. 3/13/13 at 8472-73, 8478).

Conversely, the Government argues that the evidence amply demonstrates "some

affirmative participation" by Bergrin "which, at least, encourage[d] the principal offender to

commit the offense."   (Gov't Opp'n Br. 36) (citing <u>United States v. Mercado</u>, 610 F.3d 841, 846

(3d Cir. 2010)).   The Government asserts that the evidence demonstrated that Bergrin relayed

Kemo's name as the informant on November 25 in furtherance of the plot to murder McCray, and

informed the members of the Curry organization at the December 4 Avon Avenue Meeting that if

McCray were to testify against Baskerville, Baskerville would likely spend life in prison.   (Gov't

Opp'n Br. 37).

The jury was instructed that "facilitation" for aiding and abetting purposes is "more than

associat[ion] with individuals involved in the criminal venture."   <u>See</u> <u>United States v. Soto</u>, 539

F.3d 191, 194 (3d Cir. 2008) (quoting <u>United States v. Dixon</u>, 658 F.2d 181, 189 (3d Cir. 1981)).

However, "it is not essential that the accessory know the modus operandi of the principal."

<u>Russell v. United States</u>, 222 F.2d 197, 199 (5th Cir. 1955).   Here, the Court determines that after

evidence was presented and credited by the jury that Bergrin advised the members of the Curry

organization that McCray's murder was necessary to secure the release of Baskerville, Bergrin

cannot assert that he was unaware of the particularities of the mode and method of the murder itself

to warrant acquittal.   The Court finds that evidence produced, viewed in the light most favorable

to the Government, supports a finding that Bergrin's participation rose above the level of "mere association" with criminals, and the Bergrin's representation of and association with members of a known drug organization made it rational for the jury to infer that Bergrin was aware of the consequences of advising members of the Curry organization that an informant's absence would avoid a lengthy prison sentence for a key member of the organization.  See United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) ("A defendant's 'mere presence' argument will fail in situations where the 'mere' is lacking); United States v. Bergrin, Crim No. 09-369, 2012 WL 458426, at *5 (D.N.J. Feb. 10, 2012) ("the Government presented evidence suggesting that McCray's murder was far from *fait accompli* and further suggesting that Bergrin's acts actually aided in the murder").   Even if Bergrin's argument that McCray's murder was a foregone conclusion after the November 25 conversation was credited, Bergrin would still incur accomplice liability for his actions on December 4.   As Judge Martini previously concluded, "[i]t was only after Bergrin provided this additional information—and made statements which Young interpreted as encouraging the murder to happen—that Young and other members of the Curry organization finally decided to commit the crime."   Bergrin, 2012 WL 458426, at *5.    In sum, upon consideration of the record, the Government produced ample evidence to support a jury finding that Bergrin aided and abetted in McCray's murder.   Based on the foregoing, Bergrin's motions for judgment of acquittal as to Counts Twelve and Thirteen are denied.[4]

---

[4] Bergrin argues the same analysis that is applicable to his motion for acquittal of Counts Twelve and Thirteen applies to Racketeering Act Four of Count One and Count Three.   (Def. Br. 30).   Bergrin asserts that, were the Court to enter a judgment of acquittal as to Count Twelve and Thirteen, then the corresponding Rackeering Act Four may not stand. As detailed above, this Court does not find judgment of acquittal appropriate for Counts Twelve and Thirteen and under the same reasoning, Bergrin's motion for judgment of acquittal as to Racketeering Act Four and Count Three are also denied.

**B.      Motion for Acquittal on Count Twenty-Six**

Bergrin next moves for a judgment of acquittal on Count Twenty-Six and on Racketeering

Act Eight of Count One.   To support a conviction on Count Twenty-Six, the Government was

required to prove four elements beyond a reasonable doubt:

> One that on or about September 4, 2008, in the County of Essex, in the District of
> New Jersey and elsewhere, Defendant Paul Bergrin was engaged in a trade or
> business, that is, the Law Office of Paul Bergrin.
>
> Two, that Defendant Bergrin had knowledge of the currency transaction report
> requirements.
>
> Three, that in the course of that trade or business, and with such knowledge,
> Defendant Bergrin knowingly caused or attempted to cause the trade or business to
> fail to file a Form 8300 with the Government within 15 days of a currency
> transaction wherein he received more than $10,000 in cash; and
>
> Four, the purpose of the transaction was to evade the transaction reporting
> requirements in section 5331 of Title 31.

(Tr. 3/14/13 at 8928-8929).

Bergrin argues that after the completion of the Government's case, no evidence

exists from which the jury could find beyond a reasonable doubt that Bergrin failed to file

an IRS Form 8300 "for the purpose of evading the report requirements of section 5331 or

any regulation prescribed under such section."   (Tr. 3/14/13 at 8928).   Bergrin asserts

that, as section 5331 expressly governs only cash transactions, one must deal in cash for the

purpose of evading the reporting requirement; simply having knowledge that an individual

is obligated to file a Form 8300 and not doing so is insufficient to incur liability.   (Def. Br.

44).   The Government, in turn, argues that there was ample evidence, though

circumstantial, to prove beyond a reasonable doubt that when Bergrin received $20,000

from Oscar Cordova and subsequently failed to file a Form 8300, he intended to evade the

12

reporting requirement set forth in 31 U.S.C. § 5331. (Gov't Opp'n Br. 42).

Although intent to evade the reporting requirement is a necessary element of the offense, specific intent "can rarely be proven by direct evidence, since it is a state of mind; it is usually established by drawing reasonable inferences from the available facts." United States v. Starnes, 583 F.3d 196, 213 (3d Cir. 2009) (quoting United States v. Bank of New Eng., N.A., 821 F.2d 844, 854 (1st Cir. 1987)). This Court finds that the Government met its burden as to Count Twenty-Six by offering the following at trial: (1) Bergrin was aware of the reporting obligation, evidenced by his belated filing of a Form 8300 for a previous transaction (Tr. 2/27/13 at 6732-33; Gov't Exhs. 373, 550)[5]; (2) Bergrin did not file a Form 8300 reporting the $20,000 he received from Cordova. (Tr. 2/27/13 at 6738). Furthermore, the Government presented evidence that Bergrin had a motive to avoid law enforcement scrutiny of the $20,000 received from Cordova, including: that Bergrin believed Cordova was a gang member and narcotics dealer; the $20,000 was transmitted as shrink-wrapped cash contained in a black duffel bag; and Bergrin received the same sum on a previous instance in an identical manner from Richard Pozo, a narcotics dealer. (See, e.g., Tr. 2/19/13 at 4851, 4853, 4864-67; Tr. 2/20/13 at 5024-25; Tr. 2/21/13 at 5296-97; Gov't Exh. 4123b2).

Despite the Government's contention that the question for the jury was why Bergrin failed to file Form 8300, not why Bergrin conducted the transaction with Cordova, the jury was instructed to determine whether "the purpose of the transaction: in which

---

[5] The $20,000 in cash that was the subject of that transaction was supposedly received from Carmen Dente Sr., for a retainer fee. The Government offered evidence that it in fact was supplied by cooperating witness Shelton Leverett (Tr. 3/4/13 at 7363-70) and seized during the 2007 search of Bergrin's law office. (Tr. 2/7/13 at 3431-32, 3437-42; Tr. 3/4/13 at 7537-38). The Government argued that Bergrin's misuse of an untimely filed Form 8300 form speaks to Bergrin's intent in failing to file a form for the cash from Cordova one year later.

Bergrin received the $20,000 was to evade Internal Revenue Service reporting requirements. (Tr. 3/14/13 at 8929). However, even under that standard, the jury could have reasonably inferred that, if Bergrin had the specific intent to evade the reporting requirement when he failed to file Form 8300 fifteen days after the transaction (as required by law), he possessed the same intent on the day he received the $20,000 from Cordova.

This Court finds that evidence presented at trial allowed a jury to infer that, at the time he received the $20,000 from Cordova, Bergrin feared filing a Form 8300 because reporting the sum would constitute an admission of engaging in a transaction involving proceeds of a criminal offense (i.e. narcotics trafficking) or would trigger law enforcement attention that would negatively impact ongoing criminal activity or connect Bergrin with Cordova. See generally United States v. MacPherson, 424 F.3d 183, 192-93 (2nd Cir. 2005) (noting the jury can infer specific intent from repeated violations of the reporting requirement and rejecting the suggestion that the cash at issue has to be derived from criminal activity to support a finding of specific intent).

In sum, the evidence produced sufficiently showed that Bergrin acted with specific intent to evade the reporting requirement when he failed to file a Form 8300 for the $20,000 he received from Cordova. Therefore, Bergrin's motions for judgment of acquittal as to Count Twenty-Six and Racketeering Act Eight of Count One are denied.

## C. Request for a New Trial Pursuant to FED. R. CRIM. P. 33

Bergrin asserts this Court should grant a new trial based on its denial of judicial immunity for the testimony of Jamal McNeil and Jamal Baskerville. Federal Rule of Criminal Procedure 33 provides, in relevant part, that the Court "may vacate any judgment

and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. If the motion for a new trial is based on errors alleged during the course of trial, the defendant bears the burden of showing that an error was committed and that such an error was prejudicial. United States v. D'Amario, No. 06-112, 2007 U.S. Dist LEXIS 21638, at *34 (D.N.J. March 26, 2007). Bergrin argues that this Court abused its discretion when it declined to confer immunity on Jamal McNeil and Jamal Baskerville, two defense witnesses who indicated they would invoke their Fifth Amendment rights if called to testify.

The Attorney General is given statutory authority to grant immunity to witnesses in order to obtain their testimony at trial. See 18 U.S.C. § 6003(b); Kastigar v. United States, 406 U.S. 441, 446 (1972). Despite the authority to immunize witnesses being within the Attorney General's purview, the Third Circuit in Government of Virgin Islands v. Smith allows for two narrow circumstances in which a court may immunize a defense witness: (1) where government actions denying use of immunity to defense witnesses were undertaken with the "deliberate intention of distorting the judicial fact finding process," and (2) where a witness' testimony is "essential to an effective defense." 615 F.2d 964, 968 (3d Cir. 1980). Bergrin asserts that the testimony of Jamal McNeil and Jamal Baskerville were essential to his defense and this Court's refusal to extend them judicial immunity necessitates a new trial. As both parties note, the Third Circuit alone recognizes the courts authority to extend immunity. The Circuit sat en banc "to reconsider the 'effective defense theory of judicial immunity' doctrine first established by the Court in [Smith]." United States v. Quinn, No. 11-1733 (3d Cir. July 10, 2012).

Even assuming Smith's continued vitality, there is a strong tradition of deference to

prosecutorial discretion and grants of judicial immunity "must be bounded by special safeguards and must be made subject to special conditions." Smith, 615 F.2d at 971. A District Court has the discretion to grant judicial immunity for a witness asserted as "essential to an effective defense" if five prerequisites are met: 1) immunity must be properly sought in the district court; 2) the defense witness must be available to testify; 3) the proffered testimony must be clearly exculpatory; 4) the testimony must be essential; and 5) there must be no strong governmental interests which countervail against a grant of immunity. Smith, 615 F.2d at 971. Bergrin has not sufficiently demonstrated the testimony which would be forthcoming is both clearly exculpatory and essential to his case. It is proper for the Court to deny such a motion "if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or if it is found to relate only to the credibility of the government's witnesses." Id. at 973. Further, "[i]t is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule and indulge in review by hindsight." Old Chief v. United States, 519 U.S. 172, 182 n.6 (1997).

Bearing in mind this standard, Bergrin has not demonstrated that a grant of new trial is appropriate. During trial, Bergrin's stand-by counsel made an oral application for judicial immunity for McNeil, submitting a written, yet unsworn, proffer as to what the defense anticipated McNeil would testify. (See Tr. 3/6/13 at 7838). The defense orally cited to Government of Virgin Islands v. Smith as offering legal support for its contention that this Court should issue immunity for McNeil's testimony, but did not offer a detailed argument for fulfillment of the five Smith factors. (See Tr. 3/6/13 at 7840) (citing 615 F.2d 964). During the subsequent lunch

break, the Government emailed the Court a written summary of <u>Smith</u> and its progeny. Following a conversation with McNeil's counsel and consideration of the issue, the Court denied defense counsel's oral application for judicial immunity for McNeil.   (See Tr. 3/6/13 at 7853-55).

This Court is not convinced that McNeil's proffered testimony that there was no Avon Avenue Meeting where Bergrin uttered the phrase "no Kemo, no case" would have compelled the jury to acquit.   Independent of that potential testimony, undisputed evidence demonstrated Bergrin relayed McCray's name to Curry on November 25, 2003 and such evidence could reasonably be construed as indicative of Bergrin's intent to notify the Curry organization of the negative import of McCray's potential testimony.   <u>See</u> <u>Bergrin</u>, 682 F.3d at 280 ("Pozo's testimony is, therefore, powerfully suggestive of Bergrin's intent in passing Kemo's indemnity on from Baskerville to Curry."). Furthermore, it is not clear that McNeil would have testified consistently with the information contained in the proffer.   Firstly, the proffer was unsworn and secondly, other defense witnesses fell short of providing testimony stated in the corresponding proffers. Based on the foregoing, this Court finds that Bergrin has failed to meet his burden in demonstrating proffered testimony of McNeil was "essential to an effective defense" or "clearly exculpatory."

Furthermore, this Court finds that there were "strong governmental interests which countervail[ed] against a grant of immunity."   McNeil was one of the individuals Anthony Young testified was present at the Avon Avenue Meeting in which Bergrin instructed the Curry organization that without McCray, the case against Baskerville would not survive. McNeil was also one of the two individuals chosen to execute McCray's murder and was

part of the three-car caravan that traveled to South Orange Avenue and 17th Street. (Tr. 2/1/13 at 2250-56). This Court agrees that the Government has a compelling interest in objecting to McNeil falsely exculpating Bergrin for a murder conspiracy in which Bergrin participated. See United States v. Lowell, 649 F.2d 950, 961 (3d Cir. 1981) (recognizing need to prevent conspirators from "whitewashing" each other); accord United States v. Turkish, 623 F.2d 769, 775-776 (2d Cir. 1980) ("The threat of a perjury conviction, with penalties frequently far below substantive offenses, could not be relied on to prevent such tactics."). Furthermore, it is clear that the Government may elect to prosecute McNeil for his involvement in McCray's murder at a later date.

Bergrin next argues this Court erred in not immunizing Jamal Baskerville. However, there is no record of a formal application or denial of immunity for Jamal Baskerville. He was called as a witness during the first trial in this matter and invoked his right against self-incrimination, a sequence of events both parties expected to be repeated. After the request for immunity for McNeil was resolved, stand-by counsel submitted that Bergrin "would have a similar application for Jamal Baskerville," but that "we don't have to deal with it now because he's not here[.]" (Tr. 3/6/13 at 7856). The issue thus did not ripen as, when discussing a list of remaining defense witnesses, stand-by counsel for Bergrin acknowledged that Baskerville would invoke his Fifth Amendment rights. (Tr. at 3/7/13 at 8227). When the Court responded "[s]o he's out" in reference to Jamal Baskerville's potential testimony, Bergrin did not seek immunity for Baskerville under Smith. (Tr. at 3/7/13 at 8227). Bergrin's failure to seek such immunity thus resulted in a waiver of his Smith-based claim in regards to Jamal Baskerville. See United States v.

Wright, 588 F.2d 31, 36 (2d Cir. 1978) ("Because Wright failed to subpoena Parker and to prove any need for use immunity, he cannot now demonstrate that the refusal to confer immunity prejudiced his trial."); see also United States v. Klaubner, 611 F.2d 512, 514 (4th Cir. 1979) ("Since Klauber did not call Simons to the stand, the contention that he would have asserted his Fifth Amendment right and refused to testify without a grant of immunity from the government is not established as we believe it normally would be required to be for the question Klauber raises to be preserved."). Bergrin asserts that his failure to seek a ruling particularized to Baskerville was based on his belief that this Court had "so clearly indicated its intention to deny all such applications." (Def. Br. 53 n. 5). That, however, is not the case; this Court expressly conditioned its ruling on judicial immunity as to the proposed witnesses for whom such immunity was requested.

D.      **Request for a Poll of the Jury**

Bergrin requests that this Court, pursuant to FED. R. EVID. 606(b) and Local Criminal Rule 24.1(g), inquire of the jurors whether they were exposed to extraneous information or outside influence prior to the rendering of their verdict. (Def. Br. 58). Bergrin points to the relative speed of the jury's resolution of this matter, claiming that "the jury reached its verdict so quickly on Monday, after giving every indication the preceding week that its deliberations were unhurried and that it was in the process of considering just two of the charges." (Def. Br. 58). Bergrin also speculated as to the reasoning behind the jury's request for "exhibits (audio) of conversations between Paul Bergrin and Hakeem Curry" on the date of William Baskerville's arrest, testimony from Anthony Young on February 4, 2013, Eric Dock's prison log, and whether there were "particular times" jurors

could be directed to in the recorded conversation between Hassan Miller and Anthony Young at the Hudson County Jail and what those requests meant in terms of the stage to which juror deliberations had progressed.   (See Def. Br. Exh 1, 2; Tr. 2/4/13 at 2434-2448, 2456-2459, 2467-2484).[6]

On Sunday, March 17, 2013, the *New York Daily News* published an article referring to Bergrin as "cold-blooded" and "John Gotti with a law degree—a ruthless racketeer every bit as dirty as his lowlife clients."   (See Def. Br. 47, Exh. 6).   The article also featured several photos, including one of Bergrin in a suit and tie and one of John Gotti dressed similarly.   (See Def. Br. 47, Exh. 6).   Bergrin asserts that, because the jury returned a verdict the day after the article's release, the jurors may have been exposed to prejudicial information.   (See Def. Br. 59).

Federal Rule of Evidence 606(b) provides in pertinent part:

> During an inquiry into the validity of the verdict . . . [a] juror may testify about whether (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror, or (C) a mistake was made in entering the verdict onto the verdict form.

FED. R. EVID. 606(b).   Pursuant to Rule 606(b), the Court has the discretion to question jurors to ascertain whether they encountered any extraneous prejudicial information or any outside influence during the course of their deliberations.   See Wilson v. Vermont Castings, Inc., 170 F.3d 391, 394, 395 n. 5 (3d Cir. 1999) (recognizing district courts' discretion to investigate alleged juror misconduct and extraneous information).

This Court gave clear, detailed jury instructions, providing the jurors with an

---

[6] The jury was told that it would receive Young's testimony, but for the remaining items, was informed they were either not in evidence or the jury would need to rely on their own recollection from trial.

understanding of their various limitations during the course of trial. These instructions were given initially and repeated daily. A copy of the jury's instructions to avoid all outside information and news sources was also stationed in the jury room. There is no indication that the members of the jury did not abide by these instructions. This Court rejects the idea that, merely because the juror deliberations were not lengthy, a lack of fair consideration may be assumed. Instead, this could be demonstrative of the jurors' determination that each and every count was amply supported by the evidence.

The *Star-Ledger* article featuring statements taken from an interview of Juror Number Five after the verdict is not compelling evidence of bias or of influence by prejudicial information. The Court and parties expended significant time and effort pre-screening potential jurors. Each was extensively questioned as to whether they had previous knowledge of this matter and, if so, of what nature. Subsequently, each potential juror was asked during the selection process whether they were able to be fair and impartial and took an oath to that effect once empaneled. The jury was instructed on a consistent, daily basis that jurors were forbidden to review news articles on the case. The Court will not retroactively question this juror, based on a speculative request from the defense made post-verdict.

IV. <u>CONCLUSION</u>

For the foregoing reasons, Bergrin's post-trial motions are denied.

  s/DENNIS M. CAVANAUGH
Dennis M. Cavanaugh, U.S.D.J.

Date:      July 23, 2013
Original:    Clerk's Office
cc:       All Counsel of Record
         File