# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**PAUL W. BERGRIN,**<br><br>*Defendant.* | **Criminal Action No. 09-369**<br><br>**OPINION** |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Defendant Paul W. Bergrin's ("Defendant" or "Bergrin") Motion for a New Trial under Federal Rule of Criminal Procedure 33. ECF No. 630.  The United States of America (the "Government") opposes the Motion.  ECF No. 659.  The Court has carefully reviewed the parties' submissions and the voluminous record. For the reasons set forth herein, Defendant's Motion is **DENIED**.

## I.    BACKGROUND[1]

Defendant is a former, prominent criminal defense attorney who is serving life in prison for an array of criminal conduct arising from his role as "house counsel" to drug-trafficking organizations in Newark, New Jersey.  See Bergrin, 599 F. App'x at 440.  The Government tried Defendant twice.  Before the first trial, two witness-tampering charges were severed and tried separately from the rest of the charges against Defendant.  Defendant's first trial ended in a mistrial after a jury failed to reach a unanimous verdict.  ECF No. 338.  Following an appeal by the Government and a remand from the Third Circuit, see United States v. Bergrin, 682 F.3d 261 (3d

---

[1] The parties are familiar with the facts underlying this action, which this Court and the Third Circuit have previously summarized in deciding related motions.  See, e.g., United States v. Bergrin, 599 F. App'x 439 (3d Cir. 2014); United States v. Bergrin, No. 09-369, 2013 WL 3864393 (D.N.J. July 23, 2013).  The Court therefore only briefly recites those facts pertinent to this Motion.

Cir. 2012), a second trial, in which the witness-tampering charges were not severed, occurred between January 7, 2013 and March 18, 2013 (the "Second Trial"). A new jury in the Second Trial returned an unanimous guilty verdict, convicting Defendant of, among other things, a drug-trafficking conspiracy, a murder-for-hire conspiracy, and other racketeering counts. ECF No. 537.

Defendant filed several post-trial motions after receiving his Second Trial verdict, including one for judgment of acquittal on certain counts and one for a new trial. See ECF No. 555. On July 23, 2013, the District Court denied those motions, ECF No. 565, and on September 23, 2013, it sentenced Defendant to six terms of life imprisonment, to run concurrent with seventeen additional terms of imprisonment. ECF Nos. 576-77. Defendant appealed from the judgment, ECF No. 577, and on December 18, 2014, the Third Circuit affirmed. See Bergrin, 599 F. App'x at 443; see also ECF No. 613. In particular, the panel found that "[t]he record is replete with evidence" supporting Defendant's convictions on counts related to the murder of government informant Kemo McCray, that Defendant received a fair trial, and that Defendant's sentence is proper. Id. at 440-43.

Defendant's standby counsel filed the instant Motion on June 27, 2016. ECF No. 630.[2] Defendant asserts that since the Second Trial, he has discovered new evidence demonstrating that "key government witnesses against [him], including Anthony Young [("Young")], Oscar Cordova [("Cordova")], Abdul Williams, and Eugene Braswell, have admitted that . . . [they] fabricated their testimony against him." Def. Br. at 1-2, ECF No. 630.1. Defendant also argues that the Government ignored witnesses who provided exculpatory information and has prevented one such witness from "assisting in [his] defense with respect to this motion." Id. at 2.

---

[2] On August 18, 2015, the Court appointed Gibbons P.C. ("Gibbons"), which served as standby counsel during the Second Trial and filed motions relevant to Mr. Bergrin's defense and direct appeal on his behalf, to represent Defendant in filing the instant Motion. See ECF No. 621.

Defendant's proffered "newly discovered" evidence is best summarized in three categories: (1) evidence offered to undermine Young's testimony that Bergrin "uttered the now infamous phrase 'no Kemo, no case'" and about facts preceding Kemo McCray's murder, see id. at 6-17; (2) evidence that "calls into question" the reliability of Cardova's tape-recorded conversations with Bergrin and trial testimony concerning Bergrin's conspiracy to murder witnesses cooperating against a former client, see id. at 17-22; and (3) evidence that "belies" the Government's case that Bergrin was involved in a drug-trafficking operation, see id. at 22-32. As support for his New Trial Motion, Defendant has submitted witness certifications, taped interview statements, documents submitted by his co-conspirators in related matters,[3] counsel affidavits, and other documents. See generally Def. Br. Exs. 1-17, ECF Nos. 630.2-.18.

The Government filed its opposition to the Motion on April 28, 2017. ECF No. 659. Offering over 11,000 pages of appendix material submitted on Defendant's direct appeal and over 2,500 pages of supplemental material for the Court's review, the Government argues that Defendant has not overcome his high burden of demonstrating entitlement to a new trial. See generally Gov. Br., ECF No. 659. Defendant's standby counsel submitted a reply to the Government's opposition on November 21, 2018, ECF No. 681, and on December 11, 2018, Defendant separately filed a "supplemental reply." ECF No. 686.

## II.   LEGAL STANDARD

Under Rule 33, the Court "may vacate any judgment and grant a new trial if the interests of justice so require." Fed. R. Crim. P. 33(a). Before granting a new trial motion on the grounds

---

[3] See, e.g., Def. Br. Ex. 6, ECF No. 630.7 (supplemental letter brief of William Baskerville in the matter United States v. Baskerville, 13-5881 (Nov. 23, 2015)).

of newly discovered evidence, however, the Court must be satisfied Defendant has met five requirements:

> (a) the evidence must be in fact newly discovered, i.e. discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Quiles, 618 F.3d 383, 388-89 (3d Cir. 2010) (internal quotation marks and citation omitted).  Defendant bears "a heavy burden in meeting these requirements."  United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000) (internal quotation marks and citation omitted). Consequently, failure to satisfy just one requirement will result in a denial.  United States v. Kelly, 539 F.3d 172, 182 (3d Cir. 2008).

Rule 33 motions are disfavored and "'should be granted sparingly and only in exceptional cases.'"  United States v. Mensah, 434 F. App'x 123, 126 (3d Cir. 2011) (citation omitted).  The Court must "'exercise great caution in setting aside a verdict reached after fully-conducted proceedings,' and particularly so where 'the action has been tried before a jury.'"  Kelly, 539 F.3d at 182 (quoting United States v. Kamel, 965 F.2d 484, 493 (7th Cir. 1992)).  The Court's decision on a new trial motion is discretionary, Quiles, 618 F.3d at 390, and it need not hold an evidentiary hearing before reaching its decision if resolution is appropriate from the record.  See United States v. Provenzano, 521 F. Supp. 403, 408 (D.N.J. 1981); see also United States v. Herman, 614 F.2d 369, 372 (3d Cir. 1980).

## III.   ANALYSIS

### A.   Certain "Evidence" Defendant Proffers is Not "Newly Discovered"

The first requirement to secure a new trial on newly discovered evidence is that the evidence must, in fact, be "newly discovered."  Quiles, 618 F.3d at 388.  "Evidence is not 'newly

discovered' if it 'was [actually] known or could have been known by the diligence of the defendant or his counsel.'" United States v. Cimera, 459 F.3d 452, 461 (3d Cir. 2006) (quoting United States v. Bujese, 371 F.2d 120, 125 (3d Cir. 1967)) (alteration in original).  This requirement focuses on "the substance—not the source of [the] evidence." United States v. Davis, No. 05-482, 2011 WL 5025113, at *2 (D.N.J. Oct. 21, 2011).  That means the Court must determine whether Defendant knew or could have known by reasonable diligence, at or before his trial, about the information revealed by the evidentiary source, not about the source itself. [4]  See id.  If so, Defendant is not entitled to a new trial under Rule 33, even if the source of that information was unavailable during his trial.  See United States v. Jasin, 280 F.3d 355, 362 (3d Cir. 2002) (holding that "evidence known but unavailable at trial does not constitute 'newly discovered evidence' within the meaning of Rule 33"); see also United States v. Miller, 796 F. App'x 582, 585 (11th Cir. 2019) (explaining that "newly available, exculpatory testimony of a co-defendant d[oes] not constitute newly discovered evidence" where defendant "was well aware of the proposed testimony before trial").

Defendant bore the burden to conduct reasonable diligence before or at the time of his trial, Kelly, 539 F.3d at 186, and he must allege facts from which the Court may infer he fulfilled that duty, Cimera, 459 F.3d at 461.  "Sitting on one's hands and waiting for a known eyewitness to come forward with potentially exculpatory information . . . cannot be considered—by any definition—reasonable diligence." Kelly, 539 F.3d at 186.  Simply put, "inaction . . . does not qualify as reasonable diligence." Id. at 183.  To determine whether Defendant exercised

---

[4] Though not the focus of the inquiry, the evidentiary source's identity may be relevant in assessing Defendant's requisite knowledge or diligence in discovering proffered "new" evidence.  For example, newly proffered evidence concerning an issue defendant knew would arise at trial from a source that was likely to have such evidence will generally not support a finding of reasonable diligence.  See United States v. Maldonado-Rivera, 489 F.3d 60, 69 (1st Cir. 2007) ("Where . . . the newly proffered evidence all pertains to a matter that the defendant knew would be an issue at his trial, and the source of that evidence was an obvious one, the district court ha[s] every right to deem the requirement of due diligence unsatisfied.").

reasonable diligence in discovering newly proffered evidence, the Court "must carefully consider the factual circumstances of the case."  Cimera, 459 F.3d at 461.

### 1.   Evidence Relating to Kemo McCray's Murder

Defendant first submits he has discovered evidence after the Second Trial that demonstrates Young, a government cooperator and witness who implicated Defendant in Kemo McCray's murder, "fabricated nearly all of his testimony."  Def. Br. at 7.   That evidence consists of:  (1) an affidavit from Charles Madison ("Madison"), who claims to be a childhood acquaintance of Young, ECF No. 630.2 (the "Madison Affidavit"); (2) an interview transcript of Hassan Miller ("Miller"), Young's cellmate at the Hudson County Correctional Facility (the "Hudson County Jail") in 2005, ECF No. 630.3 (the "Miller Interview"); (3) certifications from Hakeem Curry ("Curry")—the leader of a drug-trafficking organization to which Young was a member (the "Curry Organization")—Rakeem Baskerville ("Rakeem")—William Baskerville's ("William") brother—and Diedre Baskerville ("Diedre")—William's wife, ECF No. 630.5; and (4) Drug Enforcement Agency ("DEA") wiretap audio recordings of Curry (the "Curry Calls"), see Declaration of Lawrence S. Lustberg ("Lustberg Decl."), ECF No. 630.18.

### a.   The Newly Proffered Witness Statements

Defendant asserts that the witness statements he proffers are newly discovered evidence as he could not obtain them before or during his trial either because he had not learned about them or because they were "not available at that time."  Def. Br.  7-11, 15-16.  The Court finds that, of the new witness statements related to Kemo McCray's murder, only the Madison Affidavit constitutes newly discovered evidence for purposes of Rule 33.

First, the Curry and Rakeem Certifications are not newly discovered evidence because it is clear from the record that Defendant knew or should have known about Curry's and Rakeem's

proffered testimony at trial. Those certifications, sworn in 2014, state that Curry and Rakeem had no role in the conspiracy to murder Kemo McCray. See Ex. 5 at 11-12, ECF No 630.6 (the "Curry Certification"); id. at 14 (the "Rakeem Certification"). Rakeem further certifies that he did not attend the meeting between Curry, Defendant, and others after William's arrest where Defendant "stated 'no K-Mo, no case" (the "No Kemo Meeting"). Rakeem Cert ¶ 7. At trial, Defendant disputed ever attending the No Kemo Meeting as a defense to the Kemo McCray murder charge. See Def. Reply Br. at 16, ECF No. 681. It follows that if Defendant's defense was accurate, then he certainly knew that Rakeem and Curry—two of the meeting's alleged participants—would have provided testimony consistent with that defense (i.e. that the No Kemo Meeting never occurred). Accordingly, the Curry and Rakeem Certifications are not newly discovered evidence. See United States v. Webster, 516 F. App'x 182, 185 (3d Cir. 2013) (finding that defendant's father's proffered testimony that father owned gun fitting "the description" of that alleged to belong to defendant was not newly discovered evidence where defendant provided jury his own interview statements to that effect at trial).

That Curry's and Rakeem's testimonies were unavailable to Defendant during his trial because they were not "willing to take the stand" and because Curry "specifically expressed . . . his intention to invoke his Fifth Amendment right against self-incrimination if called," Def. Br. at 15, does not alter this conclusion. A codefendant's or coconspirator's testimony known to a defendant at the time of trial cannot constitute newly discovered evidence despite that individual's decision to invoke the Fifth Amendment privilege. Jasin, 280 F.3d at 368 (codefendant testimony); see also United States v. Forbes, 790 F.3d 403, 409 (2d Cir. 2015) (coconspirator testimony). Thus, because here, Defendant has failed to demonstrate that he had no actual or constructive knowledge of Curry's and Rakeem's proffered testimony, it is of no moment that either witness

declined to testify at trial.[5]  The Court concludes that the Curry and Rakeem Certifications do not constitute newly discovered evidence.

Defendant's proffer of the Miller Interview suffers from similar defects.  Defendant admits he knew before trial that Miller had secretly recorded conversations with Young while confined at the Hudson County Jail in 2005.  Def. Br. at 8.  Indeed, Defendant used those recordings to cross-examine Young at the Second Trial.  See, e.g., A3464-79, 3485-512, 3537-38;[6] see also Def. Br. at 15 ("[I]t is of course true that Bergrin played excerpts from the 2005 recordings that Miller had made of Young at both his trials.").  Nonetheless, Defendant argues that he was "wholly unaware" that "Young admitted his plan to provide false testimony specifically about [him]" and that Miller told the Government that Young told others he was lying about Defendant.  Def. Br. at 8-9.[7]

Crediting Defendant's claim that he did not actually know about Miller's newly proffered statements, Defendant has not established he exercised reasonable diligence in obtaining the substance of Miller's testimony before or at trial.  Defendant claims that he attempted a pre-trial interview of Miller but "Miller refused" for "fear of government retaliation" and "criminal sanctions."  Def. Reply Br. at 19-20; see also Def. Br. at 15 ("Miller was simply too frightened to come forward with th[e proffered] information sooner.").  He does not, however, proffer any other

---

[5] The Court agrees with Defendant that neither Jasin nor Forbes created a categorical rule precluding all codefendant and coconspirator testimony from constituting newly discovered evidence.  See Def. Reply Br. at 13-14.  Defendant, however, has not demonstrated that he was not "aware [at trial] that [Curry or Rakeem] could provide exculpatory testimony."  Forbes, 790 F.3d at 409.  In his Reply Brief, Defendant claims his defense at trial "that he never attended a meeting where he uttered the words 'No Kemo, no case,' does not mean that he must have known that neither Rakeem Baskerville nor Hakeem Curry ever participated in or were aware of any conspiracy to kill McCray."  Def. Reply Br. at 16.  But beyond stating that Curry and Rakeem would not communicate with "the defense team," Def. Br. at 18, Defendant has not provided facts on which the Court could infer he exercised reasonable diligence in learning about Curry's or Rakeem's role—or lack thereof—in the Kemo McCray murder conspiracy.

[6] For ease of reference, the Court adopts the same citations the parties use in referring to the Government's appendices submitted on Defendant's direct appeal ("A") and its supplemental material in opposition to this Motion ("SA").

[7] The Court addresses Defendant's claim that the Government failed to disclose the latter fact to the defense before trial in Section III.C., infra.

measures he took to discover any purported exculpatory information possessed by Miller.  For example, because Miller suggests that Young told others at the Hudson County Jail that he was lying about Defendant, ECF No. 630.3 at 20 ("[E]verbody on that unit knew that [Young] was lying"), and because Defendant knew Young had disclosed information about the Kemo McCray murder to at least one inmate (Miller), Defendant could have attempted to discover the substance of Miller's testimony by interviewing other persons at the Hudson County Jail during the relevant period.  Though Miller may have been the only incarcerated person wearing a wire from the Government to record Young, it is reasonable to surmise Young could have disclosed similar information to others, who were not recording him, at the Hudson County Jail.  Rule 33 is not a remedy for Defendant's failure to seek out others, within reason, who could have potentially provided the information he now proffers.  The Miller Interview is therefore not "newly discovered" evidence and cannot support Defendant's new trial motion.[8]

In a similar vein, Defendant concedes he knew about Diedre's proffered testimony before trial but was unsuccessful in subpoenaing her at that time.  Def. Br. at 16; see also A9299 (showing Defendant represented during trial that the Marshals Service attempted to serve Diedre three times with a subpoena).  Defendant submits that Diedre moved before trial to an "unknown" location and suggests that while he or his investigators eventually found her, "she refused service of [the]

---

[8] Even if the Court found that the Miller Interview constitutes newly discovered evidence, that evidence would fail the "probably produce an acquittal" requirement, see Quiles, 618 F.3d at 389, because it suffers from the same admissibility and credibility issues as Madison's statements.  See infra Section III.B.  For example, Miller's statements were not made under oath or in the presence of counsel and derive from an interview by Defendant's private investigators while he was incarcerated.  See United States v. McIntosh, No. 03-298, 2006 WL 2382259, at *3  (M.D. Pa. Aug. 16, 2016) (discerning "no indicia of reliability with respect to the substance of or circumstances of" a newly proffered witness's testimony which was unsworn and made without counsel present to private investigators).  In addition, Miller's newly proffered testimony conflicts with former statements he provided to the Government about Young's participation in Kemo McCray's murder.  See SA 2194 (stating that "Miller advised that inmate Anthony Young confessed to him repeatedly regarding shooting a federal witness known as 'Kemo'").  Compared against the sufficient evidence produced at the Second Trial on which the jury found Defendant guilty, Miller's late statements are not likely to exonerate Defendant at a new trial.

subpoena." Def. Reply Br. at 21.  Diedre's rejection of Defendant's subpoena is akin to Curry's and Rakeem's refusal to testify; therefore, that she rejected it is not grounds to find her testimony is newly discovered evidence in the face of Defendant's admission that he knew the substance of her testimony during trial.[9] See Webster, 516 F. App'x 182.

The Court is satisfied, however, that the Madison Affidavit is newly discovered evidence within Rule 33's meaning.  Defendant proffers that he was "unable to learn" about Madison's newly proffered statements before or at trial because "Madison was only motivated to 'do the right thing' and tell what he knew based on his religious scruples in 2014 after he saw Bergrin praying to God while . . . Bergrin was incarcerated." Def. Br. at 15 (citing Madison Affidavit at 2-3).  The Government offers no arguments as to why this evidence is not newly discovered, and instead highlights its other deficiencies.  See Gov. Br. at 34-38, 70 (asserting that the Madison Affidavit is merely impeaching, "demonstrably false," and "would have no impact on the verdict").  For these reasons, the Court finds Defendant has shown the Miller Affidavit is newly discovered evidence within the meaning of Rule 33.

### b.     The Curry Calls

Defendant asserts that after the Second Trial, he discovered that certain Curry Calls show Young lied about, among other things, the meeting in which Defendant uttered the phrase, "No

---

[9] Defendant's knowledge about Diedre's testimony aside, a finding that the Diedre Certification constitutes newly discovered evidence would not entitle him to a new trial.  First, Defendant offers the Diedre Certification to show that Young lied or fabricated a brief portion of his trial testimony concerning a meeting at which Defendant was neither present nor mentioned.  See Def. Br. at 10; Reply Br. at 39.  Impeachment evidence offered for this purpose cannot support a new trial.  See Quiles, 618 F.3d at 392.  Second, Defendant has not proffered any exculpatory connection between Diedre's statements and inculpatory evidence against him, see id., and the Court is skeptical one exists. Young testified that Diedre arrived at Jamal Baskerville's house on November 25, 2003, where she shared details of the Federal Bureau of Investigation's ("FBI") search of her and William's home before Defendant arrived. See A3263-65.  Young's testimony further shows Diedre left before any person present at Jamal Baskerville's residence mentioned Defendant.  See id. at 3266-69 (describing Curry's arrival after Diedre left the residence and Curry's discussion about calling Bergrin).  Young's testimony thus appears to indicate that Diedre left before Defendant was mentioned or present, and therefore, it is unlikely that her testimony as to her presence at Jamal Baskerville's house on November 25 would have any exculpatory significance to merit a new trial.

10

Kemo, no case" to Curry, Rakeem, and others at Jamal Baskerville's house.  Def. Br. at 11-15.

Defendant submits he did not review the Curry Calls before either of his trials, because the

Government decided not to introduce them[10] and represented that it suppressed "some very

damaging evidence. . .  related directly to the murder in this case."  Id. at 11 (internal quotation

marks and citation omitted); see also Def. Reply Br. at 6-7.  Defendant argues that the Curry Calls

are newly discovered evidence because he relied on the Government's representations in not

prioritizing them and, because as a pro se litigant, he was "severely constrained" in reviewing all

of the materials the Government provided to him.  See Def. Reply Br. at 6-9.

"Due diligence has not been exercised if the defendant or his counsel could have, without

unusual effort, acquired the evidence before or during the trial."  DiMattina v. United States, 949

F. Supp. 2d 387, 397 (E.D.N.Y. 2013).  Here, Defendant had the Curry Calls in his possession for

nearly three years before the Second Trial, see Gov. Br. at 20, but admits he "never listened to a

single recording pre-trial," Def. Reply Br. at 8.  Although the Court recognizes that trial

preparation is generally burdensome for pro se pre-trial detainees, it cannot ignore the reality of

Defendant's circumstances.  Defendant is not the typical pro se litigant.  He is an experienced

former state and federal prosecutor and criminal defense attorney who, in those capacities, has had

extensive training in pre-trial preparation.  Notwithstanding his own competency to evaluate

discovery, Defendant had both private counsel and learned counsel to represent him and provide

advise for several years—and at least two years after he received the Curry Calls from the

Government.  See Gov. Br. at 22; ECF Nos. 47, 225.  Since then, Defendant has continued to

receive significant assistance and resources from his former private counsel, a prominent member

---

[10] Both parties note that the Government failed to timely seal the Curry Calls and decided to "self-suppress" them
before the Second Trial.  See Def. Br. at 11; Gov. Br. at 58-59.

of one of New Jersey's biggest law firms, who was later appointed to serve as Defendant's standby counsel.[11]  See ECF No. 237.  Against this backdrop, the Court is hard-pressed to find any justification for Defendant's decision not to review a single audio recording from the Curry Calls before the Second Trial.  The Government's representation that the Curry Calls were damaging to Defendant is no excuse for Defendant's own failure to exercise any measure of diligence in reviewing them.  This is especially true given that Defendant concedes he heard from Curry, before the Government made representations about the Curry Calls' contents, that the Calls, generally, "did not prove the existence of a 'No Kemo, no case' meeting."  See Def. Reply Br. at 8-9.  In light of Defendant's lack of any effort to even attempt reviewing them for a period of nearly three years despite having ample resources to do so, the Court finds that the Curry Calls are not "newly discovered" evidence within the meaning of Rule 33.

### 2.     Evidence Relating to Conspiracy to Murder Witnesses Against Vincente Esteves ("Esteves")

Defendant next submits he has discovered evidence since the Second Trial that undermines testimony of and audio recordings taken by Cordova, a government informant who implicated Defendant in a witness-murder conspiracy related to Esteves, his former client.  Defendant proffers a memorialization of an interview with Savina Sauseda ("Sauseda"), Cordova's ex-girlfriend with whom he lived from 2009-2010 (the "Sauseda Interview").  Def. Br. at 18; see also Certification of Michael McMahon ("McMahon Cert I"), ECF No. 630.8.  He argues that the Sauseda Interview is "newly discovered" because he only learned of Sauseda's existence—and that Cordova apparently had a "recording device demonstrating the extent of his tampering" and told Sauseda he was paid to lie at trial against Defendant—when she came forward after trial.  See id. at 21.

---

[11] As indicated earlier, Defendant originally privately retained Gibbons to represent him before electing to proceed pro se.  Gibbons continued to provide standby counsel services to Defendant thereafter.

Defendant provides facts demonstrating his diligence in discovering evidence about Cordova's recordings and his testimony about those recordings before trial. See id. (explaining that Defendant hired an audio surveillance expert to review Cordova's recordings "for tampering" and called witnesses testifying to Defendant's knowledge that Cordova was an informant). The Government does not refute Defendant's claim that this evidence is newly discovered. The Court thus finds Defendant has established the Sauseda Interview is newly discovered evidence within the meaning of Rule 33.

### 3.    Evidence Relating to the Drug-Trafficking Operation

The final category of evidence Defendant proffers in support of his motion relates to his participation in a conspiracy to operate a drug-trafficking business. Def. Br. at 22. That evidence consists of: (1) an unsigned, unsworn "certification" from Yolanda Jauregui ("Jauregui"), one of Bergrin's codefendants, ECF No. 630.9 (the "Jauregui Certification"); (2) statements from Sonia Erickson ("Erickson")—the biological mother of Theresa Vannoy ("Theresa") whom Jauregui raised, ECF No. 630.11, Robert Vannoy ("Robert")—Theresa's brother and Jauregui's nephew, ECF No. 630.12, Jose Jimenez ("Jimenez")—another codefendant, ECF No, 630.13, and Amin Shariff ("Shariff"), a cooperating witness for the Government "in other matters," ECF No. 630.17 (the "Shariff Certification"); and (3) phone records between Defendant and DEA Agent Gregory Hilton ("Agent Hilton"), ECF No. 630.15 (the "Toll Records"). Def. Br. at 23-32.

### a.    The Jauregui "Certification"

Defendant argues that since his conviction, Jauregui has "had a change of heart" and has certified that Defendant had no involvement in drug trafficking activity to which she was a party. See Def. Br. at 23-26. Defendant proffers an unsigned, unsworn certification from Jauregui as

13

support.  Def. Br. Ex. 8.  The Court finds that the Jauregui Certification does not constitute newly discovered evidence.

The circumstances surrounding Defendant's efforts to procure the Jauregui Certification are suspect.  Defendant admits that he drafted the Jauregui Certification before his investigators "interviewed" Jauregui.  See Def. Reply Br. at 15.  Most troubling, the Government has submitted letters from an attorney working on Defendant's behalf—Brian P. McVan—and members of the "T.I.P.I Innocence Project" in London ("TIPI"), whereby TIPI represented to Jauregui that it secured "lucrative" rights to a book and movie deal, which were apparently contingent on Jauregui and her brother, Ramon, certifying to Defendant's innocence.  See, e.g., SA2267 (describing the purported deal), 2268 (suggesting that Jauregui's and Ramon's statements were "paramount to the story to prove the cohersion (sic) and to prove the innocence of those parties involved"), 2269 (providing instructions for executing certifications and explaining that the underlying contract is contingent on "proving innocence and the injustice of this case" and they need Jauregui's "assistance"), 2270 (stating that an affidavit was attached, giving mailing instructions, and "beg[ging Jauregui] to do this").

The letters from TIPI indicate that Defendant entered a contract that gave him "the power to direct all the money and to decide who is to assist in the production."  Id. at 2267.  TIPI stressed to Jauregui just how profitable the deal would be.  See, e.g., id. at 2268 ("I know that you know what the producers need to make this a success and I know you are so ready.  But we are talking millions and people need to be sure their investment will pay off."), 2269 ("We now have a multi-million dollar offer from Los Angeles writer [Lee] Daniels.").  One letter suggests that Jauregui rejected the proposed certification as untruthful, and TIPI responded, "Change it to the truth that you will be happy to sign and notarize."  See id. at 2271.

14

It appears Defendant never secured a signed and notarized certification from Jauregui. ECF No. 630.9. Coupled with the above background describing statements made to Jauregui about an alleged movie or book deal, before the Court is an unsigned and unnotarized certification from Jauregui. Under these circumstances, the Court finds Defendant's claim that the Jauregui Certification is "new evidence" lacks merit. [12] See Gov't of Virgin Islands v. Barton, No. F29/2003, 2004 WL 3509920, at *3-4 (Terr. V.I. Apr. 19, 2004) (concluding that affidavit defendant proffered in support of Rule 33 did not constitute newly discovered evidence based, in part, on the "highly questionable" circumstances surrounding its procurement).

### b.    The Newly Proffered Witness Statements

Defendant argues that new statements from Erickson, Theresa, Jimenez, Robert, and Shariff are newly discovered evidence warranting a new trial. The Court disagrees.

The Court first finds Defendant's argument that he could not procure Robert's "new" testimony before trial lacks merit. Defendant proffers that since the Second Trial he was only able to discover that Robert "had always told the FBI that Bergrin had no involvement in the drug business." See Def. Br. at 27. But Robert testified on Defendant's behalf at the Second Trial where he stated that he knew Defendant did not "kn[o]w at all about the drugs." A9309; see also Def. Reply Br. at 49 ("Robert testified that Bergrin had nothing to do with the drugs at Bergrin's trial."). Defendant concedes that he had an opportunity to interview Robert before calling him as

---

[12] Even if the Court disregarded the highly suspicious circumstances surrounding the Jauregui Certification, the Certification does not support a new trial. First, Defendant has failed to show he lacked knowledge about Jauregui's proposed testimony before or at trial. Just like the proffered statements from the Curry and Rakeem Certifications supposedly support Defendant's trial defense that he was not involved in any conspiracy to murder Kemo McCray, Defendant offers the Jauregui Certification to support his defense that he did not participate in drug-trafficking activity. Defendant thus should have anticipated Jauregui, one of his codefendants implicated in that same activity, would provide testimony consistent with his defense. Second, even if Jauregui's proffered statements were "newly discovered," Defendant has not provided a basis for their admissibility at a new trial. See United States v. Onque, 169 F. Supp. 3d 555, 583 (D.N.J. 2015) ("Before newly-discovered evidence can be a basis for a new trial, it must, as a threshold matter, be admissible evidence.").

a witness. Def. Reply Br. at 22. Defendant certainly could have inquired whether Robert provided any exculpatory information to the Government. He has provided no facts on which the Court may infer he exercised reasonable diligence before or at the Second Trial in discovering Robert's proffered statement before or during the Second Trial.

Defendant similarly has not met his burden to show that he could not have earlier discovered Jimenez's and Shariff's newly proffered statements through reasonable diligence. Defendant proffers new testimony from Jimenez that Defendant "didn't know anything about [the Isabella's Restaurant's drug-trafficking operation]." Def. Br at 28. However, Jimenez, as a co-defendant, was implicated in the same drug-trafficking conspiracy as Defendant. Thus, like Jauregui's alleged "new" statements, Defendant should have known that Jimenez would have provided testimony consistent with his defense at trial. Under these circumstances, this Court finds that Jimenez's proffered testimony is not newly discovered evidence. See Jasin, 280 F.3d at 368.

Defendant's proffer of Shariff's statements is likewise deficient. Defendant asserts that Shariff "emerged after trial" with testimony that Eugene Braswell, a Government witness, told him he lied about Bergrin's involvement in drug-trafficking activity. See Def. Br. at 29. To the contrary, the record shows that the Government had interviewed Shariff on several occasions in 2009—before either of Defendant's trials—about prostitution activity and his knowledge about Defendant. See SA2154-85. Defendant does not claim that he was unaware of these interviews; indeed, he admits Shariff was a Government cooperator. Def. Br. at 29. Defendant offers no facts suggesting he tried to conduct his own interview of Shariff or to secure the substance of his newly proffered testimony before the Second Trial. Absent such facts, Shariff's new statements do not constitute newly discovered evidence.

Finally, Erickson's "new" testimony consists of mostly hearsay statements that cannot constitute newly discovered evidence under Rule 33.  Defendant claims that Erickson learned from Theresa, Erickson's biological daughter, that Defendant had no knowledge of Jauregui's and Alejandro Barraza-Castro's drug-trafficking activity.  Def. Br. at 26-27.  In proffering Erickson's statements as grounds for a new trial, Defendant relies on hearsay statements attributed to Theresa. See Certification of Michael McMahon ("McMahon Cert. II") ¶¶ 5-6, ECF No, 630.11.  Because the substance of Erickson's statements derives from Theresa, Defendant must demonstrate he exercised reasonable diligence in procuring them before or during the Second Trial.  But like Shariff, Defendant has not provided any facts showing he exercised reasonable diligence to procure Theresa's testimony before or during the Second Trial. [13]  It appears that Defendant likewise failed to procure Theresa's testimony to support his original moving brief even though he learned about these alleged statements from Erickson nearly two years before he filed the instant Motion.  See Def. Br. at 26-27; Def. Reply Br. at 49 (stating that Defendant did not contact Theresa until after filing his moving brief).  Because the Court cannot infer diligence by Defendant, it concludes that Theresa's hearsay statements from Erickson's proffer cannot support Defendant's Rule 33 motion.  See Kelly, 539 F.3d at 186 ("Sitting on one's hands and waiting for a known eyewitness to come forward with potentially exculpatory information . . . cannot be considered— by any definition—reasonable diligence."). [14]

---

[13] Defendant's speculative allegation that the Government relocated Theresa to Alaska "where [his] investigators could not find [her]," Def. Reply Br. at 21, tells the Court nothing about his investigator's alleged efforts to interview her and is insufficient to demonstrate reasonable diligence.  Similarly, that the United States Marshals Service "failed to timely serve Sonia Erickson with a subpoena to testify at his trial," Def. Br. at 31, is insufficient to prove Defendant's diligence in discovering Theresa's testimony before the Second Trial.

[14] Erickson's remaining proffer is immaterial to Defendant's convictions, see McMahon Cert. II ¶ 7 (stating that during trial, a government agent "urged Erickson to provide information about [Defendant's] case to [a] news reporter"), and thus does not support a new trial.  See Quiles, 618 F.3d 383, 389 (providing that evidence must be material to the issues involved in the case, among other things, to warrant a new trial under Rule 33).

### c.       The Toll Records

Defendant argues that he was only able to obtain Agent Hilton's phone number after trial, which led him to discover fifty-four telephone calls between Defendant and Agent Hilton between 2004 and 2008.  Def. Br. at 28.  Defendant asserts that this information would have allowed him to show he reported to Hilton drug-trafficking activity of which the Second Trial jury found him guilty.  See id.  The Court finds that this evidence is newly discovered for purposes of Rule 33.

Defendant admits that he received the phone records containing Agent Hilton's phone number before his trial.  Def. Br. at 30; Def. Reply Br. at 11.  He argues, however, that the Government failed to provide the identities of those associated with the Toll Records to him before the Second Trial despite his request for that information.  Def. Reply Br. at 12.  He also claims that Hilton told his standby counsel that no such calls between them occurred.  Id.  The only reason Defendant was able to ascertain Hilton's phone number after trial was because he hired an investigator who had DEA contacts.  See id.  The Government offers no substantive rebuttal to Defendant's proffer concerning his diligence.  See Gov. Br. at 24.  The Court thus finds that, unlike the Curry Calls, Defendant has shown he exercised reasonable diligence in attempting to discover Agent Hilton's phone number before the Second Trial.  Accordingly, Agent Hilton's phone number, which provided Defendant new insight into the Toll Records, is newly discovered evidence within the meaning of Rule 33.

### B.       Evidence Defendant Proffers, While Newly Discovered, is Merely Impeaching or Cumulative and Would Probably Not Produce an Acquittal

Establishing that proffered evidence is, in fact, newly discovered is just the first hurdle Defendant must overcome to receive a new trial under Rule 33.  Defendant must also show that the evidence is more than impeaching or cumulative, i.e. that there is "a factual link between the heart of the witness's testimony at trial and the new evidence . . . . suggest[ing] directly that the

defendant was convicted wrongly." Quiles, 618 F.3d at 392.  The Court must consider whether Defendant has demonstrated an "exculpatory connection between the evidence and the offense or . . . that the newly discovered evidence totally undermine[s] critical inculpatory evidence" presented at trial. Id.  If he has not, then the evidence will not support a new trial.

If the evidence is beyond impeaching or cumulative, Defendant is only entitled to a new trial if it is material and would "probably produce an acquittal." Id. at 389.  The Court must assess "whether the proffered new evidence is credible; that is, . . . whether a jury at a second trial would likely believe the proffered evidence." Webster, 516 F. App'x at 186 (internal citation omitted); see also Kelly 539 F.3d at 189 (explaining that a district court's "focus should be on whether a jury would probably reach a different result upon hearing the new evidence").  This task involves "weigh[ing] the proffered evidence against all of the other evidence in the record," Webster, 516 F. App'x at 186, and may be performed on the papers, see Kelly 539 F.3d at 188 (internal quotation marks and citation omitted).

Here, Defendant has not established that the proffered newly discovered evidence—the Madison Affidavit, the Sauseda Interview, and the Toll Records—meets the remaining Rule 33 requirements.  First, the Sauseda Interview does not entitle Defendant to a new trial because it offers nothing more than cumulative and impeaching evidence.  At the Second Trial, Defendant presented expert testimony to support his theory that Cordova doctored the inculpatory audio recordings used against him to prove his guilt on the Esteves-related charges. See A9155-174.  On cross-examination, Defendant's expert testified that the audio recordings could not have been altered intentionally by a person, like Cordova, employing a method Sauseda now speculates Cordova used. See, e.g., id. at 9192-93; see also McMahon Cert. I ¶¶ 7-8.  That the jury found Defendant guilty of the Esteves-related charges suggests that it rejected Defendant's theory.  For

these reasons, it is clear that Sauseda's proffered statements are merely impeaching or cumulative, and, given Defendant's expert's conflicting testimony, are unlikely to produce an acquittal at trial, particularly in light of the other substantial evidence offered against Defendant. See Webster, 516 F. App'x at 186 (explaining that district court must assess whether jury would likely believe proffered evidence at new trial).

The Toll Records are likewise insufficient—they only show that Defendant and Agent Hilton exchanged telephone calls; they shine no light on the substance of those calls. In addition, Defendant does not proffer how he would admit these calls as evidence at trial. According to Defendant's standby counsel, Agent Hilton does not recall conversations he had with Defendant about Alejandro Barraza-Castro's drug-trafficking activity. See Lustberg Decl. ¶ 7. It is thus unlikely that Agent Hilton could provide any substantive, exculpatory information about the Toll Records that would influence the verdict. Alternatively, it is also not certain that, if Agent Hilton testified, any effort by Defendant to impeach him would be successful. Because the Toll Records do not provide substantive information, Agent Hilton could simply deny Defendant's proffer that they discussed Alejandro Barraza-Castro's drug-trafficking activity. Likewise, because Agent Hilton does not appear to deny the occurrence of phone calls with Defendant, see id., any attempt to impeach him about the occurrence of those calls, would likely fail. Thus, the Toll Records could not probably produce an acquittal at a new trial, particularly in light of the other substantial evidence offered against Defendant.

The Madison Affidavit is also insufficient to warrant a new trial. Madison, a childhood acquaintance of Young, states that Young told him Young did not shoot Kemo McCray and that he lied to the Government about Defendant's involvement in McCray's murder. ECF No. 630.2. While this testimony is certainly material on its face, it is exculpatory only if one credits the

hearsay statements that support it.  Defendant, however, has failed to offer any arguments to show it would be admissible at trial.  See Onque, 169 F. Supp. 3d at 583.  Even if Madison's testimony were admissible, however, Defendant has not established that it would probably produce an acquittal at a new trial.  Madison's testimony would merely offer an alternative to Young's testimony.  A new jury would weigh the witness's conflicting accounts along with other significant inculpatory evidence against Defendant that the jury heard in the Second Trial.  In addition, Madison, who has a lengthy criminal history, would be subject to credibility issues that would affect the weight the jury gives to his testimony.  See Gov. Br. at 35-36.  Finally, the jury would have to reconcile meaningful logical flaws in Madison's story, such as Young's alleged decision to falsely implicate himself in Kemo McCray's murder in exchange for leniency on a then-pending state weapons charge.  See Gov. Br. at 38 ("[A]ccording to Bergrin, Madison supports Bergrin's trial defense that Young falsely implicated himself in and pleaded guilty to a murder (for which he was not charged and faced a mandatory minimum of life imprisonment), so that he could reduce his sentence on an unrelated weapons possession case (for which he faced a far less severe sentence."). [15]  Against this backdrop, Defendant has failed to meet the high burden of demonstrating that Madison's testimony is likely to result in an acquittal.

### C.    Brady Violations

Throughout his briefing, Defendant claims the Government violated its obligations to provide him with exculpatory evidence before trial under Brady v. Maryland, 373 U.S. 83 (1963). See, e.g., Def. Br. at 9 (arguing the Government failed to disclose Miller's statement that Young told people "he was 'lying on the guy, Paul Berg[rin]'") (citing ECF No. 630.3 at 12), 27 (asserting

---

[15] Of course, it is possible that Young "wanted to provide information about a murder, in which he eventually admitted to being the shooter, in exchange for help with gun charges."  Def. Reply Br. at 30.  But Defendant's burden of convincing a jury to accept this far-fetched theory is an additional wrinkle weighing against the likelihood that Madison's testimony would produce an acquittal.

the Government "apparently ignored" Robert Vannoy's statement that "he had always told the FBI that Bergrin had no involvement in the drug business" and "did not reveal it to Mr. Bergrin's defense counsel"); Def. Reply Br. at 7 (suggesting the Government violated Brady by disclosing the Curry Calls yet omitting that they "would definitely refute" Young's testimony), 31 (arguing the Government "suppressed Miller's statements in violation of Brady").  Although it is not clear, it appears that Defendant claims he is entitled to a new trial in light of these alleged Brady violations.  The Court disagrees.

To establish a Brady violation sufficient to warrant a new trial, "a defendant must show: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material as to guilt or punishment." United States v. Pelullo, 399 F.3d 197, 209 (3d Cir. 2005) (citation omitted).  Evidence is not suppressed if the defendant could have obtained it "from other sources by exercising reasonable diligence." United States v. Perdomo, 929 F.2d 967, 973 (3d Cir. 1991).  Suppressed evidence is material where "there is a probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 516 U.S. 419, 434-35 (1995).  The inquiry whether a Brady violation warrants a new trial closely mirrors that of whether newly discovered evidence compels a new trial under Rule 33. See United States v. Beam, 635 F. App'x 28, 30 n.2 (3d Cir. 2015) ("The question of whether evidence was 'suppressed' also suggests whether it was newly-discovered, and the question of materiality can include a discussion of whether the evidence is cumulative and how it affects the guilt or innocence determination.").

None of Defendant's proffered Brady violations meet this standard.  First, the Government did not suppress the Curry Calls; they were in Defendant's possession for nearly three years before the Second Trial.  Second, Defendant had the opportunity to interview Robert before calling him

to testify on his behalf at trial.  Defendant, however, failed to exercise reasonable diligence by failing to inquire whether Robert made any exculpatory statements to the Government.  In any event, given the significant record evidence supporting Defendant's drug-trafficking convictions, it is not probable that Robert's mere statement that Defendant was not involved in drug-trafficking would have changed the result of the proceeding.  Finally, because Defendant has not shown that he exercised reasonable diligence in obtaining Miller's proffered new testimony from other sources at or before trial, and because such testimony pales in comparison to other evidence and credibility issues, see supra Section III.A. n.7, the Government's purported failure to disclose Miller's statement that Young told others he was lying about Defendant's involvement in Kemo McCray's murder does not constitute a Brady violation, and thus does not require a new trial.

## IV.   CONCLUSION

For the reasons set forth herein, Defendant's Motion for New Trial, ECF No. 630, is **DENIED**.  An appropriate Order follows.


Dated:  August 25, 2020

*/s Madeline Cox Arleo*_____
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**
